No. 20-2023
ORAL ARGUMENT REQUESTED

IN THE UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT

EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,
    Plaintiff/Appellant,

v.

ROARK-WHITTEN HOSPITALITY 2, LP d/b/a
WHITTEN INN, JAI HANUMAN, LLC, d/b/a
WHITTEN INN TAOS and/or EL CAMINO LODGE, and
SGI, LLC d/b/a EL CAMINO LODGE, and
    Defendants/Appellees.

On Appeal from the United States District Court
for the District of New Mexico, Hon. Paul Kelly, Jr.
Sitting by Designation, Case No. 1:14-cv-00884-PJK-LF

OPENING BRIEF OF THE EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION AS APPELLANT

SHARON FAST GUSTAFSON
General Counsel

JENNIFER S. GOLDSTEIN
Associate General Counsel

ELIZABETH E. THERAN
Assistant General Counsel

ANNE NOEL OCCHIALINO
Senior Appellate Attorney
EQUAL EMPLOYMENT
  OPPORTUNITY COMMISSION
Office of General Counsel
131 M St. N.E., 5th Fl.
Washington, DC 20507
(202) 663-4724
Annenoel.Occhialino@eeoc.gov

# **TABLE OF CONTENTS**

Table of Authorities ............................................................. iv

Statement of Prior or Related Appeals ............................... v

Statement of Jurisdiction..................................................... 1

Statement of the Issues ........................................................ 2

Statement of the Case .......................................................... 2

    A.    Course of Proceedings.................................................... 2

    B.    Statement of the Facts .................................................. 3

        1.    Factual Background ............................................. 3

        2.    Procedural History.............................................. 7

    C.    District Court Decisions and Hearing........................ 14

        1.    Order Dismissing SGI....................................... 14

        2.    Rule 55(b) Hearing ........................................... 16

        3.    Findings of Fact and Conclusions of Law ................. 24

Summary of Argument ........................................................ 25

Argument ............................................................................. 28

    I.    The district court erred in dismissing Jai and SGI for failure to state a claim of successor liability on notice grounds........................... 29

A.   It is well established that the successor liability doctrine applies under Title VII. ...................................................................29

B.   The EEOC plausibly pled successor liability against Jai and SGI including, if required, that each had constructive notice. ...........35

1.   The district court improperly applied a heightened pleading standard. ....................................................................35

2.   Notice is only one factor informing the successor liability inquiry. .......................................................................38

3.   Even if notice is required, EEOC pled constructive notice, which suffices under the *MacMillan*/*Trujillo* test....................40

II.   The district court abused its discretion in awarding only $35,000 in compensatory damages for the eleven aggrieved individuals. ............52

Conclusion.............................................................................66

Statement Regarding Oral Argument ...............................................68

Addendum .............................................................................

Memorandum Opinion and Order Dismissing
Fourth Amended Complaint................................................ Add.-1

Findings of Fact and Conclusions of Law on Default Hearing...... Add.-12

Final Judgment… ................................................................ Add.-30

Certificate of Compliance ................................................... C-1

Certificate of Privacy Redaction ....................................................... C-2

Certificate of Paper Copies ............................................................. C-3

Certificate of Virus Scan ................................................................ C-4

Certificate of Service ................................................................... C-5

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

## Cases

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)................................................................................28, 36

*Bates v. Pac. Maritime Ass'n*,
  744 F.2d 705 (9th Cir. 1984)......................................................................32, 33

*Bautista v. Beyond Thai Kitchen, Inc.*,
  No. 14-4335, 2015 WL 5459737 (S.D.N.Y. Sept. 17, 2015) ....................41, 48

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)...............................................................................28, 36, 51

*Bixler v. Foster*,
  596 F.3d 751 (10th Cir. 2010)...........................................................................28

*Blackburn v. Martin*,
  982 F.2d 125 (4th Cir. 1992).............................................................................66

*Cobb v. Contract Transp., Inc.*,
  452 F.3d 453 (6th Cir. 2006)................................................................34, 37, 39

*Criswell v. Delta Air Lines, Inc.*,
  868 F.2d 1093 (9th Cir. 1989)..................................................................34, 37

*Dodoo v. Seagate Tech., Inc.*,
  235 F.3d 522 (10th Cir. 2000)...........................................................................65

*EEOC v. 786 S. LLC*,
  693 F. Supp. 2d 792 (W.D. Tenn. 2010) ....................................................39, 48

*EEOC v. Fairbrook Med. Clinic, P.A.*,
  609 F.3d 320 (4th Cir. 2010).............................................................................65

*EEOC v. MacMillan Bloedel Containers, Inc.*,
    503 F.2d 1086 (6th Cir. 1974) ................................................................*passim*

*Forde v. Kee Lox Mfg. Co.*,
    584 F.2d 4 (2d Cir. 1978) ...................................................................32

*Gamez v. Country Cottage Care & Rehab.*,
    377 F. Supp. 2d 1103 (D.N.M. 2005) ........................................37, 39

*Golden State Bottling Co. v. NLRB*,
    414 U.S. 168 (1973) ...........................................................................29, 30

*Goodpaster v. ECP Am. Steel, LLC*,
    No. 09-59, 2012 WL 5267971 (N.D. Ind. Oct. 24, 2012) ...................41, 42, 51

*Guarcas v. Gourmet Heaven, LLC*,
    No. 15-056, 2016 WL 7632844 (D.R.I. Nov. 30, 2016) ............................38, 51

*Jackson v. Lockie Corp.*,
    108 F. Supp. 2d 1164 (D.N.M. 2000) ...........................................37, 40, 43, 48

*Khalik v. United Air Lines*,
    671 F.3d 1188 (10th Cir. 2012) .................................................................36, 37

*Landgraf v. USI Film Prods.*,
    511 U.S. 244 (1994) ...................................................................................54, 55

*Lipscomb v. Techs., Servs., & Info., Inc.*,
    No. 09-3344, 2011 WL 691605 (D. Md. 2011) ...............................................48

*Maldonado v. City of Altus*,
    433 F.3d 1294 (10th Cir. 2006) ...............................................................*passim*

*McDonnell Douglas Corp. v. Green*,
    411 U.S. 792 (1973) ...................................................................................35, 36

*Montes v. Vail Clinic, Inc.*,
    497 F.3d 1160 (10th Cir. 2007) ...............................................................58, 61

*Musikiwamba v. ESSI, Inc.,*
   760 F.2d 740 (7th Cir. 1985)................................................................*passim*

*In re Nat'l Airlines, Inc.,*
   700 F.2d 695 (11th Cir. 1983)...........................................................32

*Prince v. Kids Ark Learning Ctr., LLC,*
   622 F.3d 992 (8th Cir. 2010).........................................................32, 34

*Quirindongo Pacheco v. Rolon Morales,*
   953 F.2d 15 (1st Cir. 1992) ...............................................................50

*Rego v. ARC Water Treatment Co. of Pa.,*
   181 F.3d 396 (3d Cir. 1999) .....................................................32, 33, 42

*Rivera-Rivera v. Medina & Medina, Inc.,*
   898 F.3d 77 (1st Cir. 2018) ...............................................................64

*Robinson v. Sinclair Broad. Grp., Inc.,*
   182 F. Supp. 3d 742 (W.D. Mich. 2016) .........................................49

*Rojas v. TK Commc'ns, Inc.,*
   87 F.3d 745 (5th Cir. 1996).........................................................32, 33

*Sallis v. Portfolio Ambassador East, LLC,*
   No. 07-CV-2911, 2008 WL 4425876 (N.D. Ill. Sep. 25, 2008)................38, 44

*Scott v. Sopris Imports Ltd.,*
   962 F. Supp. 1356 (D.Colo. 1997)...................................................39

*Shell v. Henderson,*
   622 F. App'x 730 (10th Cir. 2015) .............................................49, 50

*Smith v. Northwest Fin. Acceptance, Inc.,*
   129 F.3d 1408 (10th Cir. 1997).......................................................65

*Steele v. Voyale Corp.,*
   88 F. App'x 916 (6th Cir. 2004) ......................................................53

vi

*Swierkiewicz v. Sorema N.A.,*
    534 U.S. 506 (2002)........................................................................29, 35, 36, 37

*Trs. of Chi. Plastering Inst. Pension Tr. v. Elite Plastering Co.,*
    603 F. .................................................................................................15, 44

*Trujillo v. Longhorn Mfg. Co.,*
    694 F.2d 221 (10th Cir. 1982)..................................................................*passim*

*U.S. EEOC v. Phase 2 Invs. Inc.,*
    310 F. Supp. 3d 550 (D. Md. 2018) ................................................................40

*Walker v. Faith Techs., Inc.,*
    344 F. Supp. 2d 1261 (D. Kan. 2004) .............................................................34

*Wheeler v. Snyder Buick, Inc.,*
    794 F.2d 1228 (7th Cir. 1986).........................................................15, 32, 44, 45

*Wiggins v. Spector Freight Sys., Inc.,*
    583 F.2d 882 (6th Cir. 1978). App.............................................................45, 47

**Statutes**

28 U.S.C. § 1291.................................................................................................1

28 U.S.C. § 1331.................................................................................................1

42 U.S.C. §1981a(b)(1) ......................................................................................16

42 U.S.C. § 1981a(b)(3) .....................................................................................54

42 U.S.C. § 1981a(b)(3)(A) ................................................................................54

42 U.S.C. § 2000e-5 ............................................................................................1

42 U.S.C. §§ 2000e *et seq.*..................................................................................8

**Other Authorities**

29 C.F.R. § 1606.7(a) ........................................................................................59

29 C.F.R. § 1606.7(b) ...................................................................24

Fed. R. App. P. 4(a)(1)(B) ...........................................................1

Fed. R. Civ. P. 8(a)(2) ...........................................................28, 36

Fed. R. Civ. P. 12(b)(6) ......................................................*passim*

Fed. R. Civ. P. 55(b) .........................................................*passim*

Fed. R. Civ. P. 55(b)(2) ...............................................11, 16, 49

## Statement of Prior or Related Appeals

There are no prior or related appeals.

## STATEMENT OF JURISDICTION

The Equal Employment Opportunity Commission ("EEOC") sued

Roark-Whitten Hospitality 2, LP, d/b/a Whitten Inn ("RW2") for

discrimination based on race, national origin, and color, and for retaliation

in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et*

*seq*. R.1.[1] The EEOC later added Jai Hanuman, LLC, d/b/a Whitten Inn Taos

and/or El Camino Lodge ("Jai"), and SGI, LLC, d/b/a El Camino Lodge

("SGI"), as defendants under a successor liability theory. App. Vol. 1 at 21-

38, 54-76.[2] The district court had jurisdiction under 28 U.S.C. § 1331 and 42

U.S.C. § 2000e-5. On December 30, 2019, the district court entered final

judgment. App. Vol. 2 at 315. The EEOC timely filed a notice of appeal on

February 27, 2020. App. Vol. 2 at 317; *see* Fed. R. App. P. 4(a)(1)(B). This

Court has jurisdiction pursuant to 28 U.S.C. § 1291.

---

[1] References to "R.* at *" are to the district court docket and page number.
[2] References to "App. Vol. * at *" are to the corresponding volume of the
EEOC's appendix and page number.

## STATEMENT OF THE ISSUES

1.     Whether the district court erred in dismissing Jai and SGI from the case under Rule 12(b)(6) on notice grounds, given that there is no set formula to determine successor liability and, in any event, the EEOC's complaint pled constructive notice.

2.     Whether the district court abused its discretion in awarding only a collective $35,000 in compensatory damages for eleven aggrieved individuals who attested that RW2's discrimination and retaliatory terminations caused them anxiety, stress, and humiliation, and, for some, financial strain, vomiting, homelessness, headaches, depression, and suicidal thoughts.

## STATEMENT OF THE CASE

### A.    Course of Proceedings

This is an employment discrimination and retaliation case against a hotel and its two successors in interest. The EEOC originally sued RW2 for discrimination based on race, color, and national origin, and for retaliation against a group of Hispanic and minority employees. R.1 The EEOC alleged that RW2 subjected the aggrieved individuals to a hostile work

environment and discrimination, and then fired or constructively

discharged them after they protested the discriminatory treatment. *Id*.

Because RW2 sold the hotel to Jai, which resold it to SGI, the EEOC

added Jai and SGI as defendants under a successor liability theory. App.

Vol. 1 at 21-40, 54-75. When RW2 and Jai failed to secure counsel or

respond to discovery, the district court entered a sanction-based default

order against them. App. Vol. 1 at 52-53. Another judge later assigned to

the case (Judge Paul Kelly Jr., sitting by designation), set aside the default

order against Jai and later dismissed both Jai and SGI for failure to

adequately plead the notice element for successor liability. App. Vol. 1 at

133; App. Vol. 2 at 298. After a Rule 55(b) hearing, the district court

awarded a collective $35,000 in compensatory damages for the eleven

victims. App. Vol. 2 at 312. The EEOC appealed. App. Vol. 2 at 317.

## B.    Statement of the Facts

### 1.    Factual Background

The Second Amended complaint makes the following allegations. In

July 2009, RW2 bought the Paragon Hotel in Taos, New Mexico. App. Vol.

1 at 26 (¶ 27). Some of the employees had worked at the hotel for years or

even decades prior to the sale. *See, e.g.*, App. Vol. 1 at 27 (¶ 38) (General

Manager Kathy Archuleta/18 years); App. Vol. 1 at 27 (¶ 41) (Maintenance

Manager Dale Quintana/21 years); App. Vol. 1 at 28 (¶ 44) (Assistant

Housekeeping Supervisor Jennie Valdez/24 years); App. Vol. 1 at 30 (¶ 71)

(Executive Housekeeper Rebecca Del Palacio/8 years). Shortly after the

purchase, RW2's owner, Lawrence Whitten, held a meeting with hotel staff

and observed that nearly all of them were "Spanish." App. Vol. 1. at 26

(¶¶ 30-31). He told them "that many, if not most … would not make it as

Whitten employees." App. Vol. 1 at 27 (¶ 32). Whitten announced that

employees "were not allowed to speak Spanish in his presence" because

"he did not understand Spanish." App. Vol. 1 at 27 (¶ 34). He told a

manager at another hotel he owned in South Carolina that he "would not

tolerate Spanish at his property in Taos."[3] App. Vol. 1 at 27 (¶ 36).

---

[3] Whitten owned several "Whitten Inn Hotels," including the ones in South Carolina and New Mexico; a central business office was in Abilene, TX. App. Vol. 1 at 26-27 (¶¶ 29a, 29d, 36). His business model is to purchase distressed hotels and then sell them for a profit. App. Vol. 1 at 184 (stating that he made twenty-one distressed hotels profitable).

Whitten treated the Hispanic employees less favorably than Anglo employees. For instance, he set unreasonably short time periods for the Hispanic housekeepers, but not the Anglo housekeeper, to clean rooms. App. Vol. 1 at 28 (¶¶ 45-46). Whitten made Hispanic employees park on the periphery of the parking lot, but he permitted the Anglo housekeeper to park closer to the hotel. App. Vol. 1 at 28 (¶¶ 47-48).

In early August, Whitten moved Victor Cardenas from his position as Front Desk Clerk to maintenance/housekeeping "because of his accent." App. Vol. 1 at 28 (¶¶ 49-50). Whitten directed Marcos Jeantette, a Front Desk Clerk, to use the Anglicized version of his name, "Mark," at work, but Jeantette refused. App. Vol. 1 at 28 (¶¶ 51, 53, 54). On August 8, Whitten asked Jeantette, who is light-skinned, if he was a "white boy"; Jeantette answered that his father was Hispanic. App. Vol. 1 at 28-29 (¶¶ 52, 55). Whitten fired Jeantette the next day. App. Vol. 1 at 29 (¶56).

Whitten told Martín Gutierrez, the Night Auditor, to go by "Martin" when he was at work, without the Spanish accent on the last syllable. App. Vol. 1 at 29 (¶¶ 57, 60). Whitten also directed Gutierrez not to "speak with

5

an accent." App. Vol. 1 at 29 (¶ 61). Gutierrez lived with his girlfriend,

Front Desk Clerk Michelle Martinez; Whitten called her "Buckwheat," a

reference "to her dark skin." App. Vol. 1 at 29 (¶¶ 58, 59). Whitten asked

other employees to Anglicize their names. *See also* App. Vol. 1 at 166

(S.Gutierrez Decl.) (Whitten told her to change her name from "Susana" to

"Susan" to "sound more Anglo").

Whitten made offensive racial and ethnic comments. App. Vol. 1 at 31

(¶ 80). He called Hispanic housekeepers who could not speak English

"wetbacks." *Id*. at ¶ 80a. He referred to African-Americans, including a

maintenance man, as "niggers." *Id*. at ¶ 80b. After firing several Hispanic

housekeepers, Whitten said "he was 'glad to get rid of all the Mexicans.'"

*Id*. at ¶ 80c.

On August 13, Gutierrez complained about the no-Spanish policy.

App. Vol. 1 at 29 (¶ 62). On August 16, Whitten fired Gutierrez and

Martinez. *Id*. at ¶ 63. The next day, a group of Hispanic employees called a

meeting with Whitten to object to the discriminatory treatment and

policies. *Id*. At the end of the meeting, Whitten fired four more Hispanic

employees, although he rescinded one of the terminations. *Id*. at ¶¶ 64-67

(Cardenas returned to work for a few weeks but then resigned). By

September 14, 2009, all but one of the Hispanic employees present at the

July 31, 2009, meeting had been fired or had resigned. App. Vol. 1 at 27

(¶ 33).

Eight employees filed charges of discrimination with the EEOC

alleging Title VII violations. App. Vol. 1 at 21-22 (¶¶ 1, 3). After an

investigation, the EEOC informed RW2 of its determination that there was

reasonable cause to believe that RW2 subjected the aggrieved individuals

to unlawful discrimination in violation of Title VII. App. Vol. 1 at 22-23

(¶¶ 4-6). On September 19, 2013, the EEOC notified RW2 that informal

conciliation efforts had been unsuccessful. App. Vol. 1 at 23 (¶ 8).

2.    Procedural History

On September 30, 2014, the EEOC filed this Title VII enforcement

action against RW2. R.1. The EEOC alleged discrimination based on race,

color, and national origin as well as retaliation and sought relief for the

eight charging parties and other aggrieved Hispanic and minority

employees. R.1; 42 U.S.C. §§ 2000e *et seq*. A few days after the EEOC filed suit, it learned that RW2 had sold the hotel and that there was a new owner. App. Vol. 1 at 24 (¶ 15). Accordingly, the EEOC amended its complaint to add a successor liability claim against "XYZ" corporation. R.4. Upon learning that Jai was the entity that had purchased the Whitten Inn, the EEOC filed a Second Amended Complaint adding Jai as a successor. App. Vol. 1 at 24-25. The complaint alleged that Jai had "notice of the Charges filed … that are subject of this lawsuit" through David Patel, its registered agent, who reported on October 5, 2014, "to news agencies that he was the new owner" of the hotel, renamed El Camino Lodge. App. Vol. 1 at 24 (¶ 15).

Jai did not own the hotel for long, selling it in September 2016 to SGI. App. Vol. 1 at 58 (¶ 27). The EEOC moved to file a Third Amended Complaint to add SGI as a successor. R.86. While that motion was pending, Jai filed a motion to dismiss the Second Amended Complaint, arguing that successor liability would be inequitable as to Jai because it no longer owned the hotel. R.96. The district court denied Jai's motion. R.178. In its

8

order, the court discussed the factors for determining successor liability under Title VII, including whether the successor had notice of the claim. R.178 at 7-10 (citing *Trujillo v. Longhorn Mfg. Co.*, 694 F.2d 221, 224-25 (10th Cir. 1982), and *EEOC v. MacMillan Bloedel Containers, Inc.*, 503 F.2d 1086, 1094 (6th Cir. 1974)). Here, the district court ruled, "the EEOC pleaded plausible factual allegations of successor employer liability against Jai, and thus stated a claim of successor employer liability." R.178 at 10; *see also* R.178 at 10-12 (finding that the EEOC adequately pled successor liability under *MacMillan/Trujillo* nine-factor test). This included a plausible allegation that "Jai had notice of the present case." R.178 at 10. The district court also permitted the EEOC to amend its complaint to add SGI, ruling that "the EEOC has stated a claim against SGI for successor liability." R.178 at 17. The EEOC later filed its Third Amended Complaint, adding SGI. R.179.

RW2 and Jai, who were represented by the same counsel, stopped communicating with their attorney, and on August 15, 2017, he filed a motion to withdraw. R.160. The magistrate judge granted the motion, but

she expressed concern about how long the case had been pending and

ordered RW2 and Jai to obtain new counsel by October 2, 2017. R.177. If

they failed to do so, the magistrate warned, they could be sanctioned "up

to and including a recommendation … to enter a default judgment." R.177

at 2. The magistrate also ordered that Whitten and Patel be deposed within

two months and that outstanding discovery responses be supplemented.

*Id*.

RW2 and Jai failed to obtain new counsel or comply with the

discovery orders by the October 2, 2017, deadline. The EEOC filed a

contempt motion requesting a default judgment. R.181. Whitten informed

the court that he lacked funds to obtain counsel but offered to pay a

collective $35,000 to the charging parties, pending a bank loan. App. Vol. 1

at 161. Patel informed the court that Jai was unable to retain a lawyer. *See*

R.187 at 3.

The magistrate judge recommended that the district court grant the

EEOC's contempt motion and enter the default judgment. R.187. The

magistrate reasoned that the failure to obtain counsel had prejudiced the

EEOC and interfered with the judicial process. R.187 at 6-7. Noting

Whitten's settlement offer of $35,000, the magistrate judge said that "if Mr.

Whitten can secure funds to honor a settlement offer, he can secure funds

to obtain counsel." *Id.* at 9. Neither RW2 nor Jai filed objections. The district

court adopted the magistrate's proposed findings, stating that a default

judgment "on all issues of liability is entered" against RW2 and Jai. App.

Vol. 1 at 53. The court stated that it would hold a Rule 55(b)(2) hearing "for

the purpose of determining the amount of damages." *Id*.

SGI filed a motion to dismiss, arguing that the complaint failed to

adequately plead successor liability, including that it had notice of the

lawsuit when it bought the hotel.[4] R.186. On July 30, 2018, the district court

granted the motion to dismiss, agreeing with SGI that the EEOC failed to

allege that SGI had notice of the EEOC's lawsuit when it purchased the

hotel. R.199 at 8. But the court allowed the EEOC to file a Fourth Amended

---

[4] For reasons unknown to the parties, the case was reassigned in January
2018 from Chief Judge Christina M. Armijo to District Court Judge Martha
Vázquez. R.194.

Complaint to add factual allegations establishing notice, a "key element of a claim for successor liability." R.199 at 9.

The EEOC was able to depose SGI's owner, Russell Harper. R.234-1. Harper knew that Jai's owner "was eager to sell" the hotel. R.234-1 at 9. Although he bought the hotel for $2.3 million, he thought it should have been selling for between $3 and $3.5 million. R.234-1 at 13 ("It's like, Man, now this isn't adding up."). He also said it was a "darn good deal, almost too good to be real," and had he known about the EEOC's lawsuit, the price "would've made sense." *Id.* Harper acknowledged that the contract had a 30-day "due diligence" period, but he said he was "in a hurry" to close the sale. R.234-1 at 8. Harper admitted that he never did an internet search for "Whitten Inn Taos" or "El Camino Lodge," although it "wouldn't take very long" to do so. R.234-at at 12.

The EEOC filed its Fourth Amended Complaint in August 2018. App. Vol. 1 at 54. The complaint included detailed factual allegations pertaining to SGI's notice of this lawsuit: In September 2016, SGI contracted with Jai to purchase the hotel. App. Vol. 1 at 59 (¶ 35a). The agreement warned that

after expiration of a thirty-day "due diligence" period, SGI released Jai

from "all claims, actions, [and] causes of action" in connection with the

hotel. *Id*. App. Vol. 1 at 60, 62 (¶¶ 35c, 35k). The "due diligence" period

allowed SGI "to review the … liabilities … necessary" for the hotel's

operation. App. Vol. 1 at 60 (¶ 35d). SGI's president was experienced in

hotel purchasing and as the result of his due diligence, he negotiated a

$300,000 discount for repairs. App. Vol. 1 at 61-62 (¶¶ 35h-g). He "was in a

hurry to buy the hotel and did not complete a thorough review of the

business during the due diligence period." App. Vol. 1 at ¶ 35*l*. He

admitted that he failed to do an internet search with the hotel's previous

names although "it would not have taken him very long" to do so. *Id*. at

¶ 35n. "[A] simple search on Google for 'Whitten Inn Taos' would reveal

information about the EEOC's lawsuit." *Id*. at ¶ 35o. Both the EEOC

charges and suit were a matter of public record prior to the sale, and SGI's

president admitted that he had the duty to perform due diligence and

"could have discovered the fact of this pending lawsuit by proper

diligence[.]" App. Vol. 1 at 62-63 (¶¶ 35p-q). Finally, SGI had constructive

notice of EEOC's suit when it bought the hotel. App. Vol. 1 at 63 (¶ 35r).

SGI filed a Rule 12(b)(6) motion to dismiss for failure to state a claim,

again arguing that it lacked notice. App. Vol. 1 at 78-84. Six months later

the case was reassigned to Judge Paul Kelly Jr., sitting by designation from

this Court. R.214.

### C.  District Court Decisions and Hearing

#### 1.  Order Dismissing SGI

The district court granted SGI's motion to dismiss. App. Vol. 1 at 133.

The court noted that in *Trujillo* this Court adopted *MacMillan*'s nine-factor

inquiry for determining successor liability under Title VII. App. Vol. 1 at

137. The court observed that "the nine *MacMillan* factors can be distilled

into a three-factor test" looking at notice, the predecessor's ability to pay,

and continuity of business operations. App. Vol. 1 at 138.

The court assumed that constructive, rather than actual, notice

suffices, but even so, it ruled, the EEOC failed to plausibly allege that SGI

had constructive notice of this suit. App. Vol. 1 at 139-40. The court rejected

the EEOC's argument that notice should be imputed because SGI would

14

have discovered the suit with a due diligence inquiry, stating that the EEOC did not plead any facts that "would have given [SGI] notice to inquire further" about the purchase. App. Vol. 1 at 141-42 (citing *Trs. of Chi. Plastering Inst. Pension Tr. v. Elite Plastering Co.*, 603 F. Supp. 2d 1143, 1151 (N.D. Ill. 2009), and *Wheeler v. Snyder Buick, Inc.*, 794 F.2d 1228, 1236 (7th Cir. 1986)). To the EEOC's observation that a simple search on Google could have revealed information about the pending EEOC suit, the court responded that it was "extremely hesitant to require a particular internet search tool, let alone impose a methodology for such searches." App. Vol. 1 at 141.  In the court's view, requiring a successor to "uncover an employment dispute involving a predecessor's predecessor, with little or no knowledge of circumstances that mandate further inquiry, would turn constructive notice into needle-in-a-haystack notice."[5] App. Vol. 1 at 142.

---

[5] Judge Kelly declined to address SGI's argument that the EEOC failed to plausibly plead other *MacMillan*/*Trujillo* factors. App. Vol. 1 at 142 n.4. Both earlier-assigned district court judges, however, appeared convinced that the EEOC had stated a claim as to all the *MacMillan* factors except notice. *Compare* R.178 at 16-18 (permitting amendment of complaint to add SGI as successor), and R.199 at 9-10 (allowing EEOC to file an amended complaint "to add allegations sufficient to cure its [notice] deficiency").

2.    Rule 55(b) Hearing

On October 3, 2019, the district court held a Rule 55(b)(2) hearing on damages as to RW2 and Jai. App. Vol. 2 at 233. An attorney made a limited appearance to represent RW2 and Jai, who had both been without counsel since September 2017. R.218; R.219.

Pursuant to Rule 55(b)(2) and the court's hearing notice, the EEOC's prehearing brief focused on damages.[6] App. Vol. 1 at 144-53. As the EEOC noted, Title VII limits compensatory and punitive damages to a combined total of $50,000 per employee for employers of RW2's size. 42 U.S.C. §1981a(b)(1). App. Vol. 1 at 149. The EEOC requested $50,000 per claimant, with $45,454.54 allocated to compensatory damages and the remainder to punitive damages, "for a total of $500,000.05" to be distributed among the eleven aggrieved individuals. *Id*.

---

[6] In addition to seeking compensatory damages, the EEOC sought punitive damages, back pay, and injunctive relief, which the court denied. The EEOC is not appealing those rulings.

In support of its request for compensatory damages, the EEOC submitted declarations from the eleven aggrieved individuals. App. Vol. 1 at 162-71. The declarations describe in poignant detail the shame, sadness, anxiety, and stress arising from Whitten's discrimination and retaliatory terminations.[7] For instance, Martín Gutierrez stated that he felt

---

[7] *See* App. Vol. 1 at 162-63, M.Gutierrez Decl. (humiliation, anger, low self-esteem, daily migraines for six months, shame, profound sadness, embarrassment, stress and financial strain impacted personal relationship, "ended up homeless"), App. Vol. 1 at 164, Jeantette Decl. (shame, stress, anxiety, sadness, worried, hard to be happy, financial strain after termination), App. Vol. 1 at 165, Quintana Decl. (stress, feared losing job, "huge depression" after termination, prescribed Xanax, sleeping problems, low self-esteem), App. Vol. 1 at 166, S.Gutierrez Decl. (nervous, anxious, fearful working for Whitten, anger, traumatic experience), App. Vol. 1 at 167, Archuleta Decl. (nervous, anxious, humiliated, stressed, low self-esteem, financial strain, vomited "all the time" while working for Whitten, low self-esteem, stress impacted personal relationship), App. Vol. 1 at 168, Del Palacio Decl. (nervous, anxious, felt degraded working for Whitten, financial strain and trouble sleeping after termination), App. Vol. 1 at 169, Cardenas Decl. (degraded, hurt, very sad, humiliated, worried, very angry, difficulty sleeping, ashamed to go in public out after termination); App. Vol. 1 at 170, Valdez Decl. (stressed, angry, and frustrated working for Whitten; termination was "very devastating" and caused financial strain and sleeping problems), App. Vol. 1 at 171, Tafoya Decl. (became homeless after termination, developed anger problems, suffered anxiety attacks, lost self-respect and dignity, became suicidal), App. Vol. 2, at 231, Martinez Decl. (degraded, afraid, very sad, embarrassed, cried, suffered stomachaches and headaches; sleeplessness after termination), App. Vol. 2

17

"humiliated," "angry," "ashamed" and "embarrassed" when Whitten

forbade them from speaking Spanish, told him to Anglicize his name, and

called his co-worker and girlfriend, Michelle Martinez, "Buckwheat"

because of her "very dark complexion." App. Vol. 1 at 162. Martinez, who

was only seventeen years old, said she was "very scared and embarrassed"

and "afraid" when working for Whitten. App. Vol. 2 at 231. When she

realized that Whitten called her "Buckwheat" not because of her front teeth

but because of the color of her skin, she felt "embarrassed and angry" as

well as "degraded." *Id*. When Whitten yelled at her, she had

"stomachaches." *Id*. She even "suffered headaches from crying because

[she] dreaded going to work when Whitten took over." *Id*.

Another employee, Kathy Archuleta, recounted that Whitten gave

Anglos preferential treatment, such as better parking privileges, and said

that "he didn't want Mexicans working there" and told her not to hire any.

---

at 232, Lovato Decl. (felt "like an ant on the ground" working for Whitten,
was anxious and fearful).

App. Vol. 1 at 167. Whitten was "very intimidating." *Id*. She felt "nervous and anxious"; working for Whitten was so stressful that she "would literally vomit all the time." *Id*. Victor Cardenas stated that when Whitten took over the hotel, he moved Cardenas from Front Desk Clerk (his job for three years) to maintenance/housekeeping because Cardenas's "accent was too thick and too strong for the customers." App. Vol. 1 at 169. This made Cardenas feel "very sad and humiliated" as well as "degraded." *Id*. Whitten called Cardenas, and other Hispanic workers and customers, "drug dealers." *Id*. Cardenas described himself as "anxious" and "nervous" working for Whitten, and he developed "difficulty at night sleeping." *Id*.

Several employees explained how hard it was to comply with the no-Spanish policy and its impact on them. Susana Gutierrez, the Supervisor of Housekeeping, stated that the policy caused her "and all the housekeeping department lots of anxiety, shock, and fear because the housekeeping department at the time were all primarily Spanish speakers knowing very little English." App. Vol. 1 at 166. Because "the words would just come out in Spanish," she was nervous and afraid. *Id*. Whitten "belittled" them on a

daily basis and "regularly put [them] down for not knowing and for not

speaking English while being in the USA." *Id*. Jose Dale Quintana stated,

"[w]hen Larry Whitten implanted the No Spanish Policy, I felt a great loss.

… I … became fearful of losing my job. It was especially stressful for me

because Spanish was my first language and the words just came out[.]"

App. Vol. 1 at 165.

The declarations also detail the emotional, and even physical, toll that

being fired had on the employees. For example, Maria Tafoya, who was

nineteen years old and had lived at the hotel before Whitten fired her,

became "homeless on the spot, losing everything as well as [her] self-

respect and [her] dignity." App. Vol. 1 at 171. When he fired Tafoya,

Whitten called the police to escort her out, in front of her co-workers,

making her feel "worthless." *Id*. Being fired caused Tafoya anger issues and

anxiety attacks, and she became depressed and had suicidal thoughts. *Id*.

Jose Dale Quintana, fired after twenty-one years on the job, had a similar

experience after his termination. App. Vol. at 1 at 165. Quintana "suffered

from anxiety and was placed on Xanax," became depressed, and had "great

20

difficulty sleeping because [he] was always worried about money." *Id*.

When Martín Gutierrez was fired, he felt "humiliated," suffered two to

three migraines a day for six months, and eventually "ended up homeless."

App. Vol. 1 at 163. After Whitten fired Rebecca del Palacio, she was

anxious and worried about paying her bills. App. Vol. 1 at 168. Jennie

Valdez had "lots of trouble sleeping" and was "always worried about

paying the bills"; her firing was "very devastating." App. Vol. 1 at 170.

After Martinez's termination, she "could not sleep from being worried."

App. Vol. 2 at 231.

RW2 and Jai filed a joint prehearing brief. App. Vol. 2 at 172. Jai

argued, *inter alia*, that the complaint failed to adequately plead the notice

factor of successor liability, requiring dismissal of the complaint under

Rule 12(b)(6). App. Vol. 2 at 179-80. Although more than a year had passed

since the sanction-based default order, they also insisted that a damage

award "makes no sense" because no Title VII violation occurred. App. Vol.

2 at 181.

At the hearing, the EEOC's attorney emphasized that because it was a default hearing, the facts alleged in the Second Amended Complaint must be accepted as true. App. Vol. 2 at 242-43. Highlighting the complaint's allegations of discrimination, he noted that Whitten referred to African-American employees as "niggers"; called Hispanic housekeepers who did not speak English "wetbacks"; called Martinez "Buckwheat" because of her dark skin color; mocked employees' accents in an effort to "ridicule … and intimidate them"; required employees to Anglicize their names; and forbade renting rooms to "certain customers who were either African American or Hispanic." App. Vol. 2 at 241-43. The EEOC's attorney also highlighted the factual allegations of retaliation, observing that Whitten fired Jeantette and the other Hispanic employees because they protested the discriminatory treatment. App. Vol. 2 at 243-44.

The EEOC's attorney invoked this Court's decision in *Maldonado v. City of Altus*, 433 F.3d 1294 (10th Cir. 2006), a case involving an English-only rule, as the complaint's "primar[y]" authority. App. Vol. 2 at 238. He emphasized that Whitten was the president of RW2 and "the one who

implemented the policies and procedures that prevented the Hispanic and

other minority employees from speaking Spanish in his presence." App.

Vol. 2 at 239. The EEOC's attorney elaborated that "the EEOC doesn't

attempt to say [that] is wrong, that if [Whitten is] communicating with one

of his Spanish-speaking employees, that they speak English. That is not the

gravamen of the case." *Id*. Rather, he explained, "[t]he policy spread to

anywhere, at pretty much at any time, on the premises, or at least as

perceived by the aggrieved individuals in the case, because they were in

fear of speaking Spanish because they didn't know when they would be in

the presence of Mr. Whitten again .…" *Id.*

EEOC's counsel repeatedly emphasized that the sanction-based

default judgment against RW2 and Jai foreclosed their merits-based

argument—woven into their pretrial brief and argument at the hearing—

that Whitten did not violate Title VII. App. Vol. 2 at 288. Defendants'

counsel maintained that damages were not warranted and that the

complaint insufficiently pled notice as to Jai.

23

3.    Findings of Fact and Conclusions of Law

After the hearing, the district court issued findings of fact and conclusions of law. App. Vol. 2 at 298-314. The court set aside the default judgment against Jai, ruling that the complaint "simply does not state a plausible claim against Jai as to successor liability on the notice element."[8] App. Vol. 2 at 308-09.

Turning to RW2, the court stated that, according to the EEOC, the "gravamen of the case is a 'No Spanish' policy allegedly implemented by Mr. Whitten." App. Vol. 2 at 310-11. The court ruled that Whitten had an "obvious" business need for employees to speak English in his presence. App. Vol. 2 at 311-12 (citing *Montes v. Vail Clinic, Inc.*, 497 F.3d 1160, 1171 (10th Cir. 2007); 29 C.F.R. § 1606.7(b)). The court acknowledged the complaint's allegations that Whitten used racial slurs, ridiculed employees' accents, treated Hispanic and Black employees and customers poorly, and fired most of the victims after the meeting. App. Vol. 2 at 312. However,

---

[8] The EEOC is not arguing on appeal that Judge Kelly lacked the discretion to set aside the default judgment.

24

"[i]n light of the relatively short time frame in which the actions occurred"

and "the stated basis of the gravamen of the" complaint (an evident

reference to the no-Spanish policy), the court awarded only a collective

$35,000 in compensatory damages. *Id*. Although the court did not explain

how it arrived at this figure, it is the exact amount that Whitten offered the

EEOC in 2017 to settle the case. App. Vol. 1 at 161.

## SUMMARY OF ARGUMENT

More than a decade ago, Lawrence Whitten purchased a distressed

hotel in Taos, New Mexico. He swiftly made clear to the Hispanic

employees that he disapproved of their Hispanic names, their accents, and

their speaking Spanish. He required them to Anglicize their names,

mocked their accents, forbade them from speaking Spanish in his presence,

called them racially offensive names such as "wetback," "nigger," and

"Buckwheat," and denied them privileges afforded his Anglo employees.

When the Hispanic employees protested, he fired them.

For these reasons, the EEOC brought this Title VII enforcement action

against RW2 for discrimination based on national origin, race, and color, as

well as retaliation. After learning the hotel was sold, and resold, the EEOC added claims of successor liability against Jai and SGI. At its core, this appeal is about the EEOC's effort through six years of litigation to obtain relief for the victims of Whitten's unlawful treatment.

The EEOC brought successor liability claims against Jai and SGI in an attempt to secure relief for the eleven victims, which is the purpose of the equitable successor liability doctrine. According to the district court, however, the EEOC failed to state a claim of successor liability as to either entity because, under this Court's nine-factor successor liability test, the EEOC failed to plausibly plead one factor: notice. But the EEOC is not required at the pleading stage to allege facts establishing each element of the nine-factor test, particularly where this Court has held there is no set formula to determine successor liability and no single factor is dispositive. In any event, the complaint plausibly pleads that Jai had constructive notice of the charges of discrimination and that SGI had constructive notice of this lawsuit, both of which satisfy the notice factor.

After entering a sanction-based default judgment against RW2 and holding a Rule 55(b) hearing, the district court awarded a collective $35,000 in compensatory damages. That award, which averaged only $3,181 per individual, was so low as to constitute an abuse of discretion. The eleven affidavits submitted at the hearing attested to the significant emotional and mental distress caused by Whitten's discriminatory and retaliatory treatment. According to the employees, some of whom had worked for years at the hotel, working for Whitten caused them shame, humiliation, stress, and anxiety; one employee found working for Whitten so stressful that she "would literally vomit all the time." After Whitten fired them, the employees endured financial strain and anxiety, and some suffered homelessness, headaches, depression, and even suicidal thoughts. RW2 offered nothing at the hearing to rebut this evidence. Because the award of $35,000 fell far short of compensating the claimants for their emotional, and even physical, harm, it constituted an abuse of discretion.

## ARGUMENT

**I.   The district court erred in dismissing Jai and SGI for failure to state a claim of successor liability on notice grounds.**

In separate orders, the district court dismissed the EEOC's claims of successor liability against Jai and SGI for failure to state a claim under Rule 12(b)(6). App. Vol. 2 at 308-09 (dismissing Jai), App. Vol. 1 at 133-143 (dismissing SGI). This Court reviews de novo a district court's dismissal under Rule 12(b)(6) for failure to state a claim. *Bixler v. Foster*, 596 F.3d 751, 756 (10th Cir. 2010).

Under Federal Rule of Civil Procedure 8(a)(2), a pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." In order to "survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 668 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The plausibility standard, however, is not a probability standard; rather, it "simply calls for enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of illegal[ity]." *Twombly*, 550 U.S. at 556. A

28

complaint need not plead facts establishing a prima facie case of discrimination. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002).

The district court failed to adhere to these standards when it dismissed Jai and SGI. Viewed under the proper legal standards, the EEOC's complaint plausibly alleged successor liability, including, if required, that each entity had constructive notice. The district court's orders of dismissal should therefore be reversed.

### A. It is well established that the successor liability doctrine applies under Title VII.

This Court has long recognized the successor liability doctrine, which is an equitable doctrine imposing liability on successor corporations for their predecessor's unlawful acts. *See Trujillo*, 694 F.2d at 225. Its application under Title VII can be traced back to labor law. *See Golden State Bottling Co. v. NLRB*, 414 U.S. 168 (1973). In *Golden State*, the Supreme Court stated that "[t]o further the public interest involved in effectuating the policies of the [National Labor Relations] Act … we are persuaded that one who acquires and operates a business of an employer found guilty of unfair labor practices in basically unchanged form" and has notice of the

29

unfair practices "should be held responsible for remedying" it. *Id.* at 171

n.2 (internal citation and quotation marks omitted). While the Court

acknowledged that doing so imposed liability on successors who had not

themselves violated the law, it stated, "in balancing the equities involved

there are other significant factors which must be taken into account.…

When a new employer is substituted in the employing industry there has

been no real change in the employing industry insofar as the victims of

past unfair labor practices are concerned, or the need for remedying those

unfair labor practices." *Id*. (internal citation and quotation marks omitted).

Relying on *Golden State*, the Sixth Circuit in *EEOC v. MacMillan*

*Bloedel Containers*, 503 F.2d 1086 (1974), applied the successor liability

doctrine to Title VII. The court reasoned that failing to hold a successor

liable under Title VII "for the discriminatory practices of its predecessor

could emasculate the relief provisions of Title VII by leaving the

discriminatee without a remedy or with an incomplete remedy. In the case

where the predecessor company no longer had any assets, monetary relief

would be precluded. Such a result could encourage evasion in the guise of

corporate transfers of ownership." *Id*. at 1091-92. The Sixth Circuit added

that "the equities of the matter favor successor liability because it is the

successor who has benefited from the discriminatory employment practices

of its predecessor." *Id.* at 1092.

Emphasizing that a successor's liability "must be determined on a

case by case basis," the *MacMillan* court set out nine factors to consider

when determining successorship liability: "1) whether the successor

company had notice of the charge, 2) the ability of the predecessor to

provide relief, 3) whether there has been a substantial continuity of

business operations, 4) whether the new employer uses the same plant, 5)

whether he uses the same or substantially the same work force, 6) whether

he uses the same or substantially the same supervisory personnel, 7)

whether the same jobs exist under substantially the same working

conditions, 8) whether he uses the same machinery, equipment and

methods of production and 9) whether he produces the same product." *Id*.

at 1091, 1094.

Although, of course, *MacMillan* itself is not binding precedent outside of the Sixth Circuit, it effectively became the lead case on successor liability under Title VII. Since *MacMillan*, every court of appeals to consider the issue, including this one, has relied on *MacMillan* or its progeny to hold that the doctrine of successor liability applies under Title VII. *See Forde v. Kee Lox Mfg. Co.*, 584 F.2d 4, 5-6 (2d Cir. 1978); *Rego v. ARC Water Treatment Co. of Pa.*, 181 F.3d 396, 401 (3d Cir. 1999); *Rojas v. TK Commc'ns, Inc.*, 87 F.3d 745, 750 (5th Cir. 1996); *Wheeler v. Snyder Buick, Inc.*, 794 F.2d 1228, 1236 (7th Cir. 1986); *Prince v. Kids Ark Learning Ctr., LLC*, 622 F.3d 992, 994-95 (8th Cir. 2010); *Bates v. Pac. Maritime Ass'n*, 744 F.2d 705, 709-10 (9th Cir. 1984); *In re Nat'l Airlines, Inc.*, 700 F.2d 695, 698 (11th Cir. 1983). We are aware of no contrary authority among the federal courts of appeals.

In *Trujillo*, this Court relied on *MacMillan* to hold that the successor liability doctrine applies to Title VII, stating: "[t]he reasoning of the Sixth Circuit is convincing and we endorse the application of the *MacMillan* factors in analyzing a successor corporation's liability under Title VII." 694 F.2d at 225. Again echoing *MacMillan*, the *Trujillo* Court stressed that "the

'nature and extent of [successor] liability is subject to no formula, but must be determined upon the facts and circumstances of each case.'" *Id.* (quoting *MacMillan*, 503 F.2d at 1092). Accordingly, in *Trujillo*, this Court held that the successor was liable for its predecessor's Title VII violation, observing that such liability would not work "an unfair hardship on the company." *Id*. (noting that successor purchased nearly all of predecessor's assets and had notice of EEOC complaint).

As the district court recognized below, some courts have distilled *MacMillan*'s nine factors into three factors that consider whether: (1) the successor had notice of the claim; (2) the predecessor is able (or was able) to provide the required relief; and (3) there was sufficient continuity of business operations. App. Vol. 1 at 138 (citing *Gamez v. Country Cottage Care & Rehab.*, 377 F. Supp. 2d 1103, 1116 (D.N.M. 2005) and *Wheeler*, 794 F.2d at 1236); *see also, e.g.*, *Rego*, 181 F.3d at 402 (recognizing three distilled factors); *Rojas*, 87 F.3d at 750 (same); *Bates*, 744 F.2d at 709-10 (same).[9] This

---

[9] The Sixth Circuit, however, has a different three-factor test, which it characterizes as its own interpretation/distillation of *MacMillan*. *See, e.g.*,

formulation focuses on the first three *MacMillan* factors (notice, predecessor's ability to provide relief, and continuity of operations), while the remaining six *MacMillan* factors "provide a foundation for analyzing the third criterion—whether there is sufficient continuity of operations between the successor and predecessor to justify successor liability." *Walker v. Faith Techs., Inc.*, 344 F. Supp. 2d 1261, 1267 (D. Kan. 2004). "Because the origins of successor liability are equitable, fairness is a prime consideration in its application." *Criswell v. Delta Air Lines, Inc.*, 868 F.2d 1093, 1094 (9th Cir. 1989) (imposing successor liability in ADEA action). This Court, however, has not adopted a three-factor formulation of the successor liability standard, and continues to apply *Trujillo*'s nine-factor test.

---

*Cobb v. Contract Transport, Inc.*, 452 F.3d 543, 551-52 (6th Cir. 2006) ("Successor liability is imposed in labor law if the court determines that it would be equitable to impose such liability considering 1) the defendant's interest, 2) the plaintiff's interest, and 3) federal policy embodied in the relevant statutes in light of the particular facts of the case and the particular duty at issue."); *see also Prince*, 622 F.3d at 995 ("'The ultimate inquiry always remains whether the imposition of the particular legal obligation at issue would be equitable and in keeping with federal policy.'") (citing and quoting *Cobb*, 452 F.3d at 554).

**B.    The EEOC plausibly pled successor liability against Jai and SGI including, if required, that each had constructive notice.**

The district court's sole basis for dismissing the successor liability claims against Jai and SGI was the EEOC's purported failure to adequately plead notice. That dismissal constituted reversible error for three reasons: 1) the district court improperly applied a heightened pleading standard; 2) notice is not necessarily required for successor liability, an equitable doctrine; and 3) even if it were, the EEOC plausibly pled that Jai and SGI had constructive notice of the charges and claims, which satisfies the notice factor.

1.    The district court improperly applied a heightened pleading standard.

The district court dismissed SGI and Jai from the case because the EEOC ostensibly failed to plead a single factor out of a multi-factor inquiry used to determine successor liability. That analysis contradicts *Swierkiewicz,* wherein the Supreme Court unanimously rejected the notion that complainants must plead facts establishing a prima facie case under *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), in order to satisfy

Rule 8(a)(2). In *Swierkiewicz*, the Court explained that the "prima facie case

under *McDonnell Douglas* … is an evidentiary standard, not a pleading

requirement." *Swierkiewicz*, 534 U.S. at 510. Requiring plaintiffs to plead a

prima facie case would also be inappropriate, the Court added, because

*McDonnell Douglas* does not apply to every case, and even when applicable,

its precise requirements vary. *Id.* at 511. The Tenth Circuit, like other courts

of appeal, has continued to apply this aspect of *Swierkiewicz* even after *Iqbal*

and *Twombly*. *See, e.g.*, *Khalik v. United Air Lines*, 671 F.3d 1188, 1192 (10th

Cir. 2012) ("[T]he 12(b)(6) standard does not require that Plaintiff establish

a prima facie case in her complaint[.]").

The district court ran afoul of *Swierkiewicz* by turning the *MacMillan*

factors for assessing successor liability into pleading requirements. Just as

the Supreme Court held in *Swierkiewicz* with respect to the *McDonnell*

*Douglas* prima facie case elements, nothing in either *Trujillo* or *MacMillan*

suggests that the successor liability factors were intended to be pleading

requirements either. And, like the *McDonnell Douglas* prima facie case, the

applicability of the *MacMillan* factors also varies from case to case. *See, e.g.*,

*Cobb v. Contract Transp., Inc.*, 452 F.3d 543, 554 (6th Cir. 2006) ("[A]ll nine [*MacMillan*] factors will not be applicable to each case."); *Criswell*, 868 F.2d at 1095 (determination of successor liability is "highly fact-specific"). To be sure, this Court has said that the elements of a claim "help to determine whether [a complaint] has set forth a plausible claim," *Khalik*, 671 F.3d at 1192, but it contravenes *Swierkiewicz* to hold, as the district court did, that the failure to plead facts plausibly alleging a *single* factor informing the successor liability analysis warrants dismissal.

The fact-specific nature of the successor liability inquiry makes it generally inappropriate to dismiss a complaint under Rule 12(b)(6) for failure to adequately allege successor liability, as underscored by the absence of decisions doing so. Review of the caselaw suggests that courts typically wait until summary judgment, or after a trial, to rule on successor liability issues. *See, e.g.*, *Trujillo*, 694 F.2d at 222 (post-trial ruling); *MacMillan*, 503 F.2d at 1088 (summary judgment); *Gamez*, 377 F. Supp. 2d at 1107 (summary judgment); *Jackson v. Lockie Corp.*, 108 F. Supp. 2d 1164, 1169 (D.N.M. 2000) (summary judgment). The district court judge initially

37

assigned to the case took this approach, stating when she denied Jai's

motion to dismiss that "several facts relevant to the *MacMillan* test … may

only be determined through discovery," including "whether Jai had notice

of the claim." R.178 at 12 n.3; *see also Guarcas v. Gourmet Heaven, LLC,* No.

15-056, 2016 WL 7632844, at *8 (D.R.I. Nov. 30, 2016) ("At the Fed. R. Civ. P.

12(b)(6) stage, courts are forgiving of claimants who struggle to

demonstrate notice before engaging in discovery."), *report and*

*recommendation adopted,* No. 15-00056, 2017 WL 127868 (D.R.I. Jan. 3, 2017);

*Sallis v. Portfolio Ambassador East, LLC,*  No. 07-CV-2911, 2008 WL 4425876,

at *5 (N.D. Ill. Sep. 25, 2008) ("[W]hether and when Portfolio had notice of

the [claim] is a question of fact that is not appropriately resolved based on

the pleadings, especially since relevant facts regarding communications

between Omni and Portfolio are likely beyond Plaintiff's purview prior to

discovery.").

> 2.    Notice is only one factor informing the successor liability
>       analysis, and is not dispositive.

Even if a complaint must plead the mandatory elements for successor

liability, dismissal under Rule 12(b)(6) was error because notice is not an

38

absolute prerequisite to successor liability. To the contrary, this Court

stated in *Trujillo* that "the 'nature and extent of [successor] liability is

*subject to no formula*, but must be determined upon the *facts and*

*circumstances of each case*.'" 694 F.2d at 225 (quoting *MacMillan*, 503 F.2d at

1092) (emphasis added). The *MacMillan/Trujillo* factors are just that—

factors—not a mandatory nine-point checklist that must be completed in

order to impose successor liability. *See Cobb*, 452 F.3d at 554 (nine factors

are not relevant to every case); *EEOC v. 786 S. LLC*, 693 F. Supp. 2d 792, 795

(W.D. Tenn. 2010) ("The presence of all nine sub-factors is not essential to a

finding of successor liability."). "No one factor is controlling. A court must

look to all of them and make its decision by balancing the interests of the

injured employee and the national policy against discrimination."

*Musikiwamba v. ESSI, Inc.*, 760 F.2d 740, 750 (7th Cir. 1985).

Thus, successor liability can be imposed even in the absence of notice.

*See id.* (notice is critical but no one *MacMillan* factor is controlling); *Gamez*,

377 F. Supp. 2d at 1123-24 (fact question existed as to successor liability,

even though successor lacked notice of EEOC charge); *but see Scott v. Sopris*

*Imports Ltd.*, 962 F. Supp. 1356, 1360 (D. Colo. 1997) (lack of notice "is

dispositive"). Because notice, although important, is not the *sine qua non* of

successor liability, the district court necessarily committed reversible error

in dismissing for the EEOC's failure to adequately plead it.

> 3.   Even if notice is required, EEOC pled constructive notice,
>      which suffices under the *MacMillan*/*Trujillo* test.

Here, the district court assumed, correctly, that constructive notice

suffices. App. Vol. 1 at 139. But the court erred by dismissing the complaint

at the pleading stage based on an overly strict application of the

"constructive notice" standard. While there is not extensive case law on the

subject, courts have articulated the standard for constructive notice in a

range of ways. Most tend to speak in terms of "due diligence"—i.e.,

whether a successor could have known of a claim's existence "with the

exercise of reasonable diligence." *Jackson*, 108 F. Supp. 2d at 1168. *See, e.g.*,

*Musikiwamba*, 760 F.2d at 752 (no notice where successor exercises "due

diligence" but fails to discover lawsuit filed on same day as purchase;

"[n]ormally, the burden" is "on the successor to find out from the

predecessor all outstanding potential and actual liabilities"); *U.S. EEOC v.*

*Phase 2 Invs. Inc.*, 310 F. Supp. 3d 550, 570 (D. Md. 2018) (in noting

applicability of due diligence standard, stating, "Courts look to notice in

this context to protect innocent purchasers that were themselves

blindsided, not to reward purchasers that choose to enter deals blindly");

*Bautista v. Beyond Thai Kitchen, Inc.*, No. 14-4335, 2015 WL 5459737, at *8

(S.D.N.Y. Sept. 17, 2015) (in FLSA case, stating that defendants "exercised

little, if any, diligence concerning" restaurant's liabilities; defendants could

have asked accountant or chef about problems at the restaurant); *Goodpaster*

*v. ECP Am. Steel, LLC.*, No. 09-59, 2012 WL 5267971, at *4 (N.D. Ind. Oct. 24,

2012) ("a complete failure to ask about prospective liabilities … can hardly

constitute due diligence" with respect to potential liabilities).

　　The concept of due diligence places the burden on the successor to

make reasonable inquiries about prospective liabilities. Using this notion as

the measure of constructive notice makes sense in light of both the

remedial purpose of Title VII and the equitable purpose of the successor

liability doctrine. *See MacMillan* 503 F.2d at 1091-92 (failing to hold

successor liable for predecessor's discriminatory practices "could

emasculate the relief provisions of Title VII by leaving the discriminatee without a remedy or an incomplete remedy"); *Trujillo*, 694 F.3d at 225 (equities favored imposing successor liability because it was the successor who benefited from the predecessor's discriminatory practices); *Rego*, 181 F.3d at 401 ("The policy underlying the [successor liability] doctrine is 'to protect an employee when the ownership of his employer suddenly changes.'") (citing and quoting *Rojas*, 87 F.3d at 750); *Goodpaster*, 2012 WL 5267971, at *4-5 (due diligence requires asking about potential liabilities; otherwise, "too many victims of employment discrimination [would go] uncompensated"), at *4 n.3 (successors should not be able to avoid liability "by playing an unspoken but mutually understood game of 'don't ask, don't tell'"). The "due diligence" standard strikes the right balance between relief to victims and fairness to successors by encouraging successors to make "reasonable inquiries" into potential liability, which can be accounted for in the purchase price. *Heavenly Hana*, 891 F.3d at 846; *see also Musikiwamba*, 760 F.2d at 752 ("The basis of the notice requirement is

that the successor has some time to negotiate a change in the purchase agreement to reflect the potential liability of a lawsuit[.]").

Here, the district court appeared to reject the "due diligence" standard based on its misunderstanding of what it entails. In its order dismissing SGI, the court mused that "[i]f the simple existence of a lawsuit were enough to impute constructive notice," prospective purchasers would have to "search infinite court dockets, using all possible names of their predecessors to determine whether potential liabilities may arise. Courts should be reluctant to impose due diligence requirements that are the product of 20-20 hindsight." App. Vol. 1 at 141. Contrary to the district court's understanding, due diligence is not "a strict liability standard." *Heavenly Hana*, 891 F.3d at 847. Rather, it is a *due* diligence standard: it permits notice to be imputed only where the successor's "*reasonable* diligence" would have revealed the underlying claim. *Jackson*, 108 F. Supp. 2d at 1168 (emphasis added).

The district court further opined, "The notice analysis does not turn on the diligence exercised. Rather, it turns on whether there were facts and

43

circumstances of which a party had a duty to take notice." App. Vol. 1 at

142. In other words, the district court required for constructive notice that

there be "some facts" prompting a prospective buyer to "perform [due]

diligence." *Id*.; *see also* App. Vol. 2 at 310 (concluding that Jai lacked notice,

despite complaint's allegations that Patel had constructive notice of EEOC

charges). Not only does this alternative standard make little sense (since

apparently even the existence of a pending EEOC lawsuit did not suffice to

meet it), but the district court relied for support on one cherry-picked

Seventh Circuit case and one district court case that have contrary case law

within their jurisdictions. *See* App. Vol. 2 at 141 (dismissing SGI and citing

*Wheeler*, 794 F.2d at 1237 & n.9, and *Trs. of Chi. Plastering Inst. Pension Tr.*,

603 F. Supp. 2d at 1151); *but see, e.g.*, *Musikiwamba*, 760 F.2d at 752 (burden

normally on successor "to find out from the predecessor all outstanding

potential and actual liabilities"); *Sallis*, 2008 WL 4425876, at *5 (applying

due diligence standard to establish constructive notice).

    In fact, the district court's characterization notwithstanding, *Wheeler*

does not reject the due diligence standard at all. *Wheeler* expressly

44

acknowledged that in *Musikiwamba* the Seventh Circuit had "strongly embraced" not only the "essential" nature of the successor liability doctrine in employment discrimination cases but the "liberalization of that concept in favor of victims of discrimination in employment." 794 F.2d at 1237. Accordingly, the *Wheeler* court stated, "[w]e are not prepared to hold that absence of timely actual knowledge is a bar to successor liability in every case." *Id.* Rather, the court held that successor liability was not warranted because of the circumstances of that case, which included the availability of substantial relief from the predecessor. *Id*.

In emphasizing the importance of the notice requirement, the district court also relied on *Wiggins v. Spector Freight Sys., Inc.*, 583 F.2d 882, 886 (6th Cir. 1978). App. Vol. 1 at 138-39 (order dismissing SGI). Ironically, *Wiggins* suggests that constructive notice exists if EEOC charges were pending at the time of purchase. *See Wiggins*, 583 F.2d at 886 (notice factor would have been satisfied if successor had actual notice *or* if EEOC charges were pending at the time of purchase). Nothing in *Wiggins* suggests, as the

district court held, that some additional "facts" are required to prompt a prospective buyer to perform its due diligence. App. Vol. 1 at 141.

Viewed under the correct interpretation of the "due diligence" standard, the complaint plausibly pled that Jai had constructive notice. Although this is, of course, not determinative, we note that the district court judge originally assigned to the case found that the EEOC plausibly alleged that "Jai had notice of the present case." R.178 at 10. She was correct. The Second Amended Complaint alleged that on October 5, 2014—five years after the charges were filed, and after the EEOC notified RW2 of its reasonable cause finding and the failure of conciliation—David Patel (Jai's registered agent) reported that he was the new owner of the Whitten Hotel. App. Vol. 1 at 23-24 (¶¶ 6, 8, 14, 15). The complaint added that "[t]hrough Patel, Jai … had notice of the Charges filed with the Commission that are the subject of this lawsuit." App. Vol. 1 at 24 (¶ 15). The EEOC further alleged that RW2 operated the hotel as the "Whitten Inn." App. Vol. 1 at 23-24.

These facts, and the reasonable inferences to be drawn from them, plausibly suggest that Patel could have discovered the eight pending EEOC charges, as well as the reasonable cause finding, and failure of conciliation notice, had he asked Whitten about any outstanding liabilities. At a minimum, it is plausible that an internet search using the hotel's name would have alerted him to the employees' widely publicized allegations of discrimination and retaliation.[10] This satisfies the due diligence standard. *See Wiggins*, 583 F.2d at 886 (suggesting notice could have been satisfied with evidence that EEOC charges were pending); *Musikiwamba*, 760 F.2d at

---

[10] An internet search for "Whitten Inn Taos" assuredly would have revealed the allegations of discrimination and retaliation well before the Commission filed suit. Civil rights groups protested outside the Whitten Inn in November 2009 holding signs reading "Boycott Whitten Inn," as seen on a YouTube posting from November 2009. *See* "Whitten Inn Demonstration" (published 11/16/09), https://www.youtube.com/watch?v=V2Sgy55Vin8. Additionally, news stories were published in 2009 about the discrimination and retaliation at the Whitten Inn in Taos. See, e.g., App. Vol. 2 at 210 (10/26/09 AP article titled, "Hotel owner Larry Whitten charged as racist after forcing employees to drop Hispanic names"); http://www.nydailynews.com/news/national/hotel-owner-larry-whitten-charged-racist-forcing-employees-drop-hispanic-names-article-1.388127 (10/26/09 article).

752 (normally, successor bears burden of "find[ing] out from the predecessor all outstanding potential and actual liabilities"); *786 South*, 693 F. Supp. 2d at 795 ("It is well accepted that constructive notice may suffice … at least where the relevant charges have been filed with the EEOC."); *see also Bautista*, 2015 WL 5459737, at *2, *8 (defendants failed to exercise due diligence where they did not ask about potential liabilities and plaintiff had been negotiating FLSA claim with predecessor's attorney prior to purchase); *Lipscomb v. Techs., Servs., & Info., Inc.*, No. 09-3344, 2011 WL 691605, at *8 (D. Md. Feb. 18, 2011) (constructive notice satisfied where "due diligence" would have revealed EEOC charge filed during purchase negotiations).

The facts pled thus distinguish this case from others in which EEOC charges were *not* pending before the purchase and, unsurprisingly, the courts found no notice. *See Jackson*, 108 F. Supp. 2d at 1168 (stating that "there is no evidence that [successor] knew or with the exercise of reasonable diligence could have known prior to its purchase" of the plaintiff's Title VII claim where EEOC charge was filed "after the

48

purchase"); *Robinson v. Sinclair Broad. Grp., Inc.*, 182 F. Supp. 3d 742, 747 (W.D. Mich. 2016) (no notice where employer lacked actual notice and plaintiff filed EEOC charge after purchase occurred). Additionally, had the EEOC been able to depose Patel—which it was unable to do because Jai disobeyed the court's order to permit the deposition—the EEOC could have asked him if "some facts" (such as an unexpectedly low purchase price, or a hurry to sell) should have prompted a reasonably diligent search of potential liabilities.

Finally, if this Court concludes that the complaint did not plausibly allege notice, the EEOC should be permitted to amend it. After concluding that the complaint plausibly alleged notice as to Jai, Chief Judge Armijo ordered default entered against Jai and said she would hold a Rule 55(b)(2) hearing as to damages. App. Vol. 1 at 53. Judge Kelly's notice setting the hearing date also referred only to damages. R.216 (setting default hearing "on relief"). The EEOC thus "reasonably assume[d] that [its] only obligation in that hearing was to prove damages." *Shell v. Henderson*, 622 F. App'x 730, 733 (10th Cir. 2015) (district court abused its discretion in failing

to warn plaintiff that Rule 55(b) hearing would address liability). Judge

Kelly never warned the EEOC that he was reconsidering the notice issue,

although he chastised the EEOC for failing to address notice at the hearing.

*See* App. Vol. 2 at 310 ("Nothing in the SAC or *the default hearing*"

suggested that Jai had notice) (emphasis added). That constituted

reversible error. *See Shell*, 622 F. App'x at 733-34 (remanding where district

court failed to notify plaintiff that Rule 55(b) hearing would address

merits); *Quirindongo Pacheco v. Rolon Morales*, 953 F.2d 15, 16 (1st Cir. 1992)

(same).

The district court also erred in concluding that the EEOC failed to

plausibly plead that SGI had notice. The complaint's allegations against

SGI are robust. As detailed *supra* at 12-13, the EEOC plausibly and

specifically alleged that a reasonably diligent search would have alerted

SGI to this lawsuit, which was pending for two years before SGI purchased

the hotel from Jai. The complaint alleged, *inter alia*, that SGI's president

failed to do a Google search for "Whitten Inn Taos," which would have

alerted him to the "lawsuit and the underlying dispute with the

employees." App. Vol. 1 at 62 (¶ 35o). The complaint alleged that the

president *admitted* that under the terms of the contract "he had the duty to

act and perform his duty of due diligence," and that had he done so, "he

could have discovered … this pending lawsuit." App. Vol. 1 at 63 (¶ 35q).

These allegations more than sufficed to satisfy the due diligence standard

at the pleading stage, as they allege that SGI could have learned of this

pending lawsuit had the president simply asked Jai about potential

liabilities, or if he had done a reasonably diligent internet search. *See supra*

at 47-48 (citing cases); *see also Guarcas*, 2016 WL 7632844, at *8 ("A pleading

establishing that the litigation is a matter of public record in a court docket

permits the inference of notice."); *Goodpaster*, 2012 WL 5267971, at *4

(constructive notice established where successor "took no steps at all to

discover" pending ADEA suit).

     The facts pled, and the reasonable inferences to be drawn from them,

also raised "a reasonable expectation that discovery w[ould] reveal

evidence" of red flags that SGI ignored. *Twombly*, 550 U.S. at 556. This

satisfied even the district court's narrow view of the due diligence standard

as requiring "some facts" to trigger a due diligence inquiry. App. Vol. 1 at 141. This expectation actually came to pass, as SGI's president testified at his deposition that the purchase price was between $700,000 and $1,200,000 less than he had expected and was a "darn good deal, almost too good to be real." *See supra* at 12. Further, he knew that Jai's owner was in a hurry to sell. *Id*. Although EEOC did not include these facts in the Fourth Amended Complaint, their existence underscores the district court's legal error in ruling—even under its view of the due diligence standard—that the complaint failed to state a claim under Rule 12(b)(6).

## II.  The district court abused its discretion in awarding only $35,000 in compensatory damages for the eleven aggrieved individuals.

The district court awarded a collective $35,000 in compensatory damages against RW2. App. Vol. 2 at 312. That minimal award was so low as to constitute an abuse of discretion. *See Olcott*, 327 F.3d at 1124 (reviewing default judgment for abuse of discretion and stating, "We will not disturb the court's decision without a clear showing that the decision was based on a clearly erroneous factual finding or that it manifests a clear error of judgment.").

52

Where, as here, a default judgment is entered, a plaintiff's well-pleaded allegations of fact are admitted, and the defendant is barred from challenging them on appeal. *See id.* at 1125; *see also Steele v. Voyale Corp.*, 88 F. App'x 916, 917 (6th Cir. 2004) (in Title VII case, affirming exclusion at Rule 55(b) hearing of defendant's evidence undermining the plaintiff's claim that her termination caused her emotional distress). Accordingly, the well-pleaded facts in the Second Amended Complaint concerning the discrimination and retaliation are admitted.

At the Rule 55(b) hearing, the EEOC offered unrebutted evidence of the significant emotional—and even physical—harm the discrimination and retaliation caused the eleven aggrieved individuals. That evidence warranted a compensatory damage award far higher than $35,000 (averaging only $3,181 per individual), making the award an abuse of discretion. The district court offered no explanation for how it settled on $35,000, although that happens to be exactly what Whitten offered to settle the case in 2017. However the district court arrived at this figure, it fell

woefully short of compensating the eleven aggrieved individuals for the emotional distress inflicted by Whitten's treatment.

Compensatory damages are available under 42 U.S.C. § 1981a(b)(3) to compensate for "emotional pain, suffering, inconvenience, mental anguish, [and] loss of enjoyment of life[.]" They were not originally available under Title VII, but Congress amended the statute to permit their recovery as part of the 1991 Civil Rights Act. In so doing, it aimed to "further Title VII's 'central statutory purposes of eradicating discrimination throughout the economy and making persons whole for injuries suffered through past discrimination.'" *Landgraf v. USI Film Prods.*, 511 U.S. 244, 254-55 (1994) (discussing compensatory and punitive damages) (quoting *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 421 (1975)). The statutory cap for a combined award of compensatory and punitive damages for an employer of Whitten's size is $50,000 per employee. 42 U.S.C. § 1981a(b)(3)(A).

Citing Whitten's discriminatory and retaliatory actions and the emotional distress described in the eleven declarations, the EEOC requested compensatory damages of at least $45,454.54 per individual.

App. Vol. 1 at 149; *see* App. Vol. 2 at 241-43. The district court awarded a

fraction of that: a *collective* $35,000, which averages out to just $3,181.81 per

aggrieved individual. That amount does not account for the significant

"pain, suffering, inconvenience, mental anguish, [and] loss of enjoyment of

life" the victims described. Nor is it sufficient to further Title VII's goal of

eradicating discrimination and making employees whole. *See Landgraf*, 511

U.S. at 254.

As discussed *supra* at 16-21, the individuals attested that Whitten's

discriminatory treatment and retaliatory firings caused stress, anxiety,

shame, humiliation, anxiety, low self-esteem, and—for some—vomiting,

relationship strains, sleeping problems, headaches, anxiety, depression,

stomachaches, financial strain, and homelessness. For instance, Martín

Gutierrez stated that he felt "embarrassed of [his] culture and [his] own

race" after Whitten told him to Anglicize his name and prohibited them

from speaking "Spanish at work anymore especially in front of him and the

customers." App. Vol. 1 at 162. Hearing Whitten call his girlfriend,

Michelle Martinez, "Buckwheat" due to her dark complexion made

Gutierrez angry and sad; after Whitten fired him, Gutierrez did not like to

go out in public and had daily "severe migraine headaches" for six months.

*Id*.

The district court offered only two justifications for the minimal

award: (1) "the relatively short time frame" the victims worked for

Whitten; and (2) the court's view that the "gravamen" of the complaint was

the "No Spanish" policy. App. Vol. 2 at 312. Neither proffered reason

supports such an arbitrarily low award of compensatory damages. To be

sure, the victims, several of whom had worked at the hotel for years or

decades before RW2 purchased it, worked for Whitten for less than two

months. But this was because Whitten either fired them after they

complained of the discriminatory treatment, or they were constructively

discharged. And each individual offered evidence that working for

Whitten, even briefly, caused them emotional pain and mental suffering.

Kathy Archuleta, for instance, recounted that Whitten gave Anglo

(but not Hispanic) employees days off and parking privileges, said "he

didn't want Mexicans working there," and told her not to hire Mexican

workers. App. Vol. 1 at 167. She "dreaded going to work," finding it so stressful that she "would literally vomit all the time." *Id*. As Archuleta's declaration illustrates, this was not a workplace with a few casually inoffensive comments; it was a workplace riddled with severe hostility towards Hispanic employees and customers.

And, insofar as Whitten's "no-Spanish" policy, as implemented in this case, contributed to the hostile work environment, that only *bolsters* support for a significant award of compensatory damages. As the EEOC's attorney explained at the hearing, the employees never knew when Whitten might be around, leaving them in constant fear of getting in trouble for speaking Spanish "in his presence." App. Vol. 2 at 239. The employees' declarations confirm that the discrimination, including the "no-Spanish" policy, caused them significant emotional distress. Jose Dale Quintana explained that the "No-Spanish" policy made him fearful that he would lose his job "because Spanish was [his] first language and the words just came out." App. Vol. 1 at 165. Susana Gutierrez told a similar story, stating that because she is a native Spanish speaker who knows "little

English," she felt "nervous all the time because the words would just come out in Spanish and [she] was always afraid to get in trouble." App. Vol. 1 at 166. The policy caused her and the staff "lots of anxiety, shock, and fear," and Whitten "belittled" them and "regularly put [them] down for not knowing and for not speaking English while being in the USA*." Id*. (Whitten called them "awful names" that no one had ever called her).

It appears that the district court may have also discounted the emotional distress caused by the no-Spanish policy because, in the court's view, the policy did not itself violate Title VII. App. Vol. 2 at 311 (stating that Whitten had an "obvious" business need for it). But this Court has long recognized that "English-only instructions … can, in certain circumstances, 'create[ ] a hostile atmosphere for Hispanics in their workplace' and thus violate Title VII" as intentional discrimination. *Montes*, 497 F.3d at 1170 (quoting *Maldonado*, 433 F.3d at 1304) & n.15. In *Maldonado*, this Court held that a jury could find that the English-only policy in that case, which effectively prohibited Spanish if any non-Spanish speakers were present, contributed to a hostile work environment. 433 F.3d at 1305-

06. This Court stated that the plaintiff had "produced evidence that the English-only policy created a hostile atmosphere for Hispanics in their workplace … all the Plaintiffs stated that they had experienced ethnic taunting as a result of the policy," which "made them feel like second-class citizens." *Id*. at 1304. This Court further reasoned that "the very fact that the City would forbid Hispanics from using their preferred language could reasonably be construed as an expression of hostility towards Hispanics," at least in the absence of a legitimate purpose for the restrictions. *Id*. at 1305. Accordingly, this Court explained, forbidding employees from speaking Spanish during breaks or in private conversations, if non-Spanish speakers were present, would support an "inference of hostility" unless there was a "legitimate reason" for the restriction. *Id*.

Here, much like the policy in *Maldonado*, the EEOC's complaint and claimants' declarations suggest that the No-Spanish policy effectively operated as a blanket ban on speaking Spanish, thereby "creat[ing] a hostile atmosphere for Hispanics in their workplace." *Id*. at 1304. *See generally* 29 C.F.R. § 1606.7(a) (guideline stating that an English-only rule

59

applied "at all times" may create an atmosphere of inferiority, isolation, and intimidation based on national origin and presumptively violates Title VII). As in *Maldonado*, where the policy was accompanied by ethnic taunting and made the employees feel like "second-class citizens," in this case the policy was coupled with racial slurs and disparate treatment that made the employees feel inferior. For instance, Michelle Martinez stated the policy made her feel "bad about [her]self" and that Whitten "looked down on us." App. Vol. 2 at 231. Rebecca del Palacio stated that the policy was "very offensive" and that Whitten made her feel "degraded like I was lower than him because I was Hispanic." App. Vol. 1 at 168.

Even viewing the policy more narrowly, however, it is far from clear why Whitten broadly prohibited his employees from speaking *any* Spanish in his presence, even when they were not addressing him. The policy seemingly banned employees from speaking Spanish to each other or to family or friends, by phone or in person. Whitten never explained why he needed such a broad policy, supporting the conclusion that the no-Spanish policy contributed to a hostile work environment. *See generally Maldonado*,

433 F.3d at 1305 (reasonable to infer that English-only policy was "an

expression of hostility to Hispanics" if "there was no apparent legitimate

purpose for the restrictions").

To be sure, a targeted, narrow English-only rule might not create or

contribute to a hostile work environment where, as in *Montes*, it was

unaccompanied by racial slurs and disparate treatment. But when an

English-only rule is implemented by a company owner who calls his

Hispanic housekeepers who do not speak English "wetbacks," calls

another Hispanic employee "Buckwheat" because of her dark complexion,

and ridicules employees for their Spanish accents, the policy acts to

humiliate, degrade, anger, and embarrass, and communicates that

Hispanic employees are inferior. App. Vol. 1 at 29, 31 (¶¶59, 80); *see*

*Maldonado*, 433 F.3d at 1308 (finding jury question as to intentionally

discriminatory hostile work environment based on English-only policy

where, *inter alia*, mayor referred to the Spanish language as "garbage"). The

employees' declarations underscore this. *See, e.g.*, App. Vol. 1 at 170

(Valdez) (discussing no-Spanish policy and discriminatory treatment and

stating "Whitten was very intimidating and attacked our culture"); App.

Vol. 1 at 166 (S. Gutierrez) (no-Spanish policy "caused me and all the

housekeeping department lots of anxiety, shock, and fear"; Whitten

"belittled" us and "regularly put [us] down for not knowing and for not

speaking English while being in the USA").

The district court's cursory compensatory damages analysis, and its

undue focus on the no-Spanish policy, glossed over the other serious

allegations of discrimination that warranted a sizable compensatory

damage award. Early in its order, the court acknowledged that the

complaint includes allegations that Whitten "used racial epithets, ridiculed

an employee's accent, treated Hispanic and Black employees and

customers poorly, and otherwise treated the employees of color differently

from White employees." App. Vol. 2 at 311 (citing R.87, ¶¶ 78-83). In fact,

the complaint lays bare the odious nature of Whitten's slurs, which

included "wetback," "nigger," and "Buckwheat." Given the backdrop

against which Whitten imposed his "No-Spanish" policy, the employees

understandably interpreted it as another manifestation of Whitten's anti-

Hispanic animus and part of the overall hostile work environment. And their declarations make clear that working in such an environment, even briefly, inflicted substantial emotional distress and mental anguish, which lingered long after their fleeting employment with Whitten ended.

The district court's award also constituted an abuse of discretion because it fails to account for the emotional, and physical, harm caused by the retaliatory terminations. As discussed *supra* at 20-21, being fired caused the claimants significant distress. Nineteen-year-old Maria Tafoya became "homeless on the spot, losing everything as well as [her] self-respect and [her] dignity," and she became depressed and suicidal. App. Vol. 1 at 171. Jose Dale Quintana, fired after twenty-one years on the job, "suffered from anxiety and was placed on Xanax," went through a "huge depression," and had "great difficulty sleeping because [he] was always worried about money." App. Vol. 1 at 165. Martín Gutierrez felt "humiliated," suffered two to three migraines a day for six months, endured financial difficulty, and eventually became homeless. App. Vol. 1 at 162-63. Rebecca del Palacio was anxious and worried about paying her bills. App. Vol. 1 at 168. Marcos

Jeantette "felt betrayed and angry when Whitten fired [him] based on the color of [his] skin and not on [his] work or what [he] could offer." App. Vol. 1 at 164. Being fired was a "traumatic experience" for Susana Gutierrez. App. Vol. 1 at 166. After his termination, Victor Cardenas was "ashamed to go out in public" and mostly talked only to Kathy Archuleta. App. Vol. 1 at 169. Jennie Valdez, who worked twenty-four years at the hotel, felt "cheated" and found it "very devastating" to go without a pay check; she had sleeping issues and financial strain. App. Vol. 1 at 170. Michelle Martinez, only seventeen years old, also had sleeping problems "from being worried." App. Vol. 2 at 231.

The district court also erred in failing to accord any significance to Whitten's status as the owner of the company. App. Vol. 2 at 239, 243 (emphasizing that Whitten was "the president"). This enhanced the severity of Whitten's treatment and, necessarily, the emotional impact of it. *See generally Rivera-Rivera v. Medina & Medina, Inc.*, 898 F.3d 77, 95-96 (1st Cir. 2018) (jury question existed as to retaliatory hostile work environment perpetrated by co-owner, who screamed at plaintiff, intimidated her, and

64

threatened to fire her); *EEOC v. Fairbrook Med. Clinic, P.A.*, 609 F.3d 320, 329

(4th Cir. 2010) (jury could find that harassment's severity "was exacerbated

by the fact that [the harasser] was not only Waechter's immediate

supervisor but also the sole owner" of the medical clinic). Because there

was no one above Whitten to whom they could complain about the no-

Spanish policy, racial slurs, mocking remarks, and disparate treatment—

and because Whitten fired those who did complain—the employees

understandably found that working for Whitten caused them "lots of

stress," "anxiety," and "fear," leaving them "sad," "angry," "fearful,"

"embarrassed," "humiliated," and "degraded." *See supra* at 17 n.8.

The inadequacy of the collective $35,000 award here is underscored

by comparison to compensatory damage awards this Court has affirmed in

other cases with similar (and even less severe) evidence of emotional

distress. *See, e.g.*, *Dodoo v. Seagate Tech., Inc.*, 235 F.3d 522, 532 (10th Cir.

2000) (affirming $125,000 award where plaintiff "testified that he has

trouble sleeping and wakes up with his heart pounding, not knowing

where he is" and felt his hard work went unrecognized); *Smith v. Northwest*

*Fin. Acceptance, Inc.*, 129 F.3d 1408, 1416 (10th Cir. 1997) (upholding

$200,000 award where plaintiff's harm included "nausea, migraines,

humiliation, degradation, loss of self-respect, sleeplessness, consumption of

sleeping pills, frequent crying, loss of a loan officer career, and stress in

Plaintiff's relationship with her daughter"). *Cf. Blackburn v. Martin*, 982 F.2d

125, 132 (4th Cir. 1992) (Secretary's denial of compensatory damages under

Energy Reorganization Act constituted an abuse of discretion where

employee's termination caused "loss of self-esteem and emotional

problems," including stress). Accordingly, the award constituted an abuse

of discretion, warranting remand to the district court for reassessment.

## <u>CONCLUSION</u>

For the foregoing reasons, the judgment of the district court should

be vacated and the case remanded for further proceedings.

Respectfully submitted,

SHARON FAST GUSTAFSON
General Counsel

JENNIFER S. GOLDSTEIN
Associate General Counsel

ELIZABETH E. THERAN
Assistant General Counsel

s/Anne Noel Occhialino
ANNE NOEL OCCHIALINO
Senior Appellate Attorney
EQUAL EMPLOYMENT
  OPPORTUNITY COMMISSION
Office of General Counsel
131 M St. N.E., 5th Fl.
Washington, D.C. 20507
(202) 663-4724
Annenoel.Occhialino@eeoc.gov

## Statement Regarding Oral Argument

The EEOC requests oral argument because of the complexity of the issues involved, which are critical to the EEOC's enforcement efforts. This Court has not yet addressed whether the notice element of successor liability can be satisfied with constructive notice, and, if so, how that standard is satisfied. This appeal also challenges the district court's arbitrarily low award of compensatory damages, which requires close examination of the factual record.

# ADDENDUM

Addendum Table of Contents

Memorandum Opinion and Ordering Dismissing Fourth Amended
Complaint, R.215 ..................................................................................................1

Findings of Fact and Conclusions of Law on Default Hearing, R.226 ..........12

Final Judgment, R.227 .........................................................................................30

# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION,

      Plaintiff,

v.

ROARK WHITTEN HOSPITALITY 2,
LP d/b/a WHITTEN INN, JAI
HANUMAN, LLC, d/b/a WHITTEN INN
TAOS AND/OR EL CAMINO LODGE,
AND SGI, LLC d/b/a EL CAMINO
LODGE,

      Defendants.

No. 1:14-cv-00884-PJK-LF

## MEMORANDUM OPINION AND ORDER
## DISMISSING FOURTH AMENDED COMPLAINT

     THIS MATTER is before the court on Defendant SGI, LLC's Motion to Dismiss for Lack of Subject Matter Jurisdiction and Failure to State a Claim filed September 10, 2018.  ECF No. 203.  Upon consideration thereof, the motion to dismiss is well taken and should be granted on the basis of a failure to state a claim, not lack of subject matter jurisdiction.[1]

---

[1] This case was transferred to the undersigned in June 2019.

## Background

The Equal Employment Opportunity Commission (EEOC) filed this public enforcement action on September 30, 2014 seeking relief for eight named parties. Compl. (ECF No. 1).  The Complaint alleged that Defendant Roark-Whitten Hospitality 2 (RW2) engaged in unlawful employment practices by creating a hostile work environment, engaging in discriminatory practices, and retaliating against employees at a hotel owned by RW2 in Taos, New Mexico (Taos Hotel).  Id. at ¶¶ 77-97.  After learning that RW2 sold the Taos Hotel, the EEOC filed an amended complaint on December 22, 2014, adding as a defendant "the unknown owner and/or XYZ Company(s)/Corporations."  Am. Compl. at 2 (ECF No. 4).

Thereafter, the EEOC moved to substitute Jai Hanuman LLC "for the previously unknown XYZ Company(s)/Corporations."  Pl's Renewed Mot. to Am. Compl. at 1 (ECF No. 52).  The court granted the request, and the EEOC filed its Second Amended Complaint.  ECF No. 87.  On December 16, 2016, after learning that Defendant Jai sold the Taos Hotel to SGI, LLC (SGI), the EEOC filed its second motion to amend the complaint to add SGI as a defendant.  ECF No. 86.  Jai and RW2 opposed the addition of SGI, ECF No. 94, and Jai moved to dismiss the Second Amended Complaint pursuant to Fed. R. Civ. P. 12(b)(6).  ECF No. 96.  The court granted the EEOC's second motion to amend and denied Jai's motion to dismiss.  ECF No. 178.

On September 28, 2017, the EEOC filed its Third Amended Complaint adding SGI as a party under a theory of successor liability.  ECF No. 179.  SGI moved to dismiss the Third Amended Complaint for failure to state a claim.  ECF No. 186.  SGI argued that

2

the EEOC failed to plead adequately the essential elements necessary to establish successor liability, including that SGI had notice of the lawsuit at the time it purchased the Taos Hotel.  Id.  The court ruled that although the Third Amended Complaint adequately pled many of the essential elements of successor liability, it failed to adequately plead that SGI had notice of the lawsuit at the time it purchased the Taos Hotel.  Mem. Op. and Order at 8–10 (July 30, 2018) (ECF No. 199).  While the court granted SGI's motion to dismiss, it also granted leave to the EEOC to amend its complaint to cure the notice issue.  Id. at 9–10.

On August 13, 2018, the EEOC filed its Fourth Amended Complaint.  ECF No. 201.  On September 10, 2018, SGI moved to dismiss the Fourth Amended Complaint under Rule 12(b)(1) for lack of subject matter jurisdiction and under Rule 12(b)(6) for failure to state a claim upon which relief can be granted.  The court now considers this motion.  ECF No. 203.

## Discussion

### A.  Subject Matter Jurisdiction

SGI argues that the EEOC failed to adequately allege notice in connection with successor jurisdiction,  Def.'s Mot. to Dismiss at 2 (ECF No. 203).  SGI argues that before determining successor liability, a court must determine if it maintains jurisdiction over a Title VII claim.  Id.  The EEOC does not address SGI's jurisdictional argument in its response, but the court concludes that SGI's argument is foreclosed by Supreme Court precedent.  See Fort Bend Cty. v. Davis, 139 S. Ct. 1843, 1850–51 (2019).

SGI argues that Title VII's charge-filing requirement must be satisfied to confer subject-matter jurisdiction.  Def.'s Mot. to Dismiss at 2–4.  According to SGI, because successor companies are not named in the original EEOC charge, a court lacks subject-matter jurisdiction over successor companies unless the successor had notice of the Title VII charge and an opportunity to voluntarily comply with the law.  Id.  The Supreme Court recently held that "Title VII's charge-filing requirement is not of jurisdictional cast."  Fort Bend Cty., 139 S. Ct. at 1850–51.  The Court explained that "federal courts exercise jurisdiction over Title VII actions pursuant to 28 U.S.C. § 1331's grant of general federal-question jurisdiction, and Title VII's own jurisdictional provision, 42 U.S.C. § 2000e–5(f)(3)."  Id.  Accordingly, the court rejects SGI's jurisdictional challenge because it is now clear that Title VII jurisdiction does not hinge on notice.

**B.  Successor Liability**

SGI also urges dismissal under Rule 12(b)(6) because the EEOC's Fourth Amended Complaint does not sufficiently allege that SGI had actual or constructive notice of the pending EEOC claim when it purchased the Taos Hotel from Jai and therefore does not support a claim of successor liability.  Def.'s Mot. to Dismiss at 4–8.  The court agrees.

To survive a motion to dismiss for failure to state a claim under Rule 12(b)(6), the complaint must contain sufficient facts that, taken as true, state a claim to relief that is plausible on its face.  See Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).  The court accepts all facts alleged in a well-pleaded complaint as true and views the facts in the light most favorable to the plaintiff.  Potts v. Ctr. for Excellence in Higher Educ., Inc.,

908 F.3d 610, 613 (10th Cir. 2018).  But labels and conclusions cannot suffice for facts.

Twombly, 550 U.S. at 555.

The general rule of nonliability for successor corporations is subject to four

exceptions: "(1) [w]here the purchaser expressly or impliedly agrees to assume such

debts; (2) where the transaction amounts to a consolidation or merger of the corporations;

(3) where the purchasing corporation is merely a continuation of the selling corporation;

and (4) where the transaction is entered into fraudulently in order to escape liability for

such debts."  Trujillo v. Longhorn Mfg. Co., 694 F.2d 221, 224 (10th Cir. 1982) (quoting

W. Tex. Ref. & Dev. Co. v. Comm'r of Internal Revenue, 68 F.2d 77, 81 (10th Cir.

1933)).

As noted during this litigation, Mem. Op. and Order at 6 (ECF No. 199), the Tenth

Circuit broadened Trujillo's third exception — i.e., the "continuation buyer" exception —

in the context of Title VII claims by adopting the Sixth Circuit's nine-factor test for

determining successor liability.  See Trujillo, 694 F.2d at 224–25 & n.4.[2]

---

[2]  The MacMillan factors include:

> 1) whether the successor company had notice of the charge, 2) the
> ability of the predecessor to provide relief, 3) whether there has been a
> substantial continuity of business operations, 4) whether the new employer
> uses the same plant, 5) whether he uses the same or substantially the same
> work force, 6) whether he uses the same or substantially the same supervisory
> personnel, 7) whether the same jobs exist under substantially the same
> working conditions, 8) whether he uses the same machinery, equipment and
> methods of production and 9) whether he produces the same product.

EEOC v. MacMillan Bloedel Containers, Inc., 503 F.2d 1086, 1094 (6th Cir.
1974).  Although the EEOC argues that it is "premature to conduct the fact-

The nine <u>MacMillan</u> factors can be distilled into a three-factor test: "(1) whether the successor employer had prior notice of the claim against the predecessor; (2) whether the predecessor is able, or was able prior to the purchase, to provide the relief requested; and (3) whether there has been a sufficient continuity in the business operations of the predecessor and successor." <u>Gamez v. Country Cottage Care & Rehab.</u>, 377 F. Supp. 2d 1103, 1116 (D.N.M. 2005) ((quoting <u>Wheeler v. Snyder Buick, Inc.</u>, 794 F.2d 1228, 1236 (7th Cir. 1986)). "Of the three criteria to be considered, the first two — (1) notice of the claim to the successor prior to the purchase of assets and (2) the ability of the predecessor to provide the relief requested by the plaintiff—are the most important." <u>Jackson v. Lockie Corp.</u>, 108 F. Supp. 2d 1164, 1167 (D. Colo 2000). These two factors are critical because of the "inequity of holding a successor liable when the predecessor is fully capable of providing relief or when the successor did not have the opportunity to protect itself by an indemnification clause or lower purchase price." <u>Gamez</u>, 377 F. Supp. 2d at 1117 (quoting <u>Wheeler</u>, 794 F.2d at 1236 (internal quotations omitted)).

Shortly after deciding <u>MacMillan</u>, the Sixth Circuit affirmed the importance of the notice requirement, holding that <u>MacMillan</u>'s broader exception to successor liability should not apply when (1) charges were not filed with the EEOC at the time of the acquisition and (2) the successor corporation had no notice of any claim of discrimination

---

intensive weighing of the <u>MacMillan</u> factors," Pl.'s Resp. in Opp'n to Mot. at 17 (ECF No. 206), this court's decision is one on the sufficiency of the complaint given a motion to dismiss, a pure question of law. <u>See Ashcroft v. Iqbal</u>, 556 U.S. 662, 674 (2009); <u>Lowe v. Raemisch</u>, 864 F.3d 1205, 1207 (10th Cir. 2017).

Add.-006

at the time of the acquisition. See Wiggins v. Spector Freight Sys., Inc., 583 F.2d 882, 886 (6th Cir. 1978). Given the importance of the notice factor, the court now analyzes whether the EEOC has adequately alleged that SGI had notice of the claim.

The Tenth Circuit has not decided whether constructive notice constitutes notice in this context. That said, a few district courts within the circuit have concluded that such notice is sufficient. See, e.g., Walker v. Faith Techs., Inc., 344 F. Supp. 2d 1261, 1268–69 (D. Kan. 2004); Scott v. Sopris Imps. Ltd., 962 F. Supp. 1356, 1359 (D. Colo. 1997). Assuming without deciding that constructive notice is sufficient, the Fourth Amended Complaint's allegations are insufficient to show constructive notice as explained below. Constructive notice is a legal presumption that arises "from the existence of facts and circumstances that a party had a duty to take notice of" and is imputed to the party regardless whether the party actually had notice of the particular factual circumstance. Constructive Notice, Black's Law Dictionary (11th ed. 2019).

SGI points out that the EEOC has not alleged that SGI had actual notice of the pending claims. Def.'s Mot. to Dismiss at 4. The EEOC does not argue otherwise. No allegation claims that SGI had actual notice of the EEOC's lawsuit in the Fourth Amended Complaint. Accordingly, the next question is whether the Fourth Amended Complaint alleges facts sufficient to plausibly support constructive notice.

SGI argues that the Fourth Amended Complaint does not allege facts sufficient to show constructive notice. Def.'s Mot. to Dismiss at 4–8. The court agrees. The EEOC's factual allegations relevant to the question of constructive notice fall into several categories:

(1) the terms of the purchase agreement between SGI and the seller, including

  SGI's right to conduct due diligence, Fourth Am. Compl. ¶¶ 35(a)–(f), (h)–(k);

(2) the existence of the lawsuit at the time of the purchase and what a Google

  search for "Whitten Inn Taos" would have revealed about the lawsuit and

  dispute, id. ¶¶ 35(g), (o), (p);

(3) the due diligence that SGI conducted and SGI's president's statement that he

  could have discovered the lawsuit through due diligence, id. ¶¶ 35(l)–(n), (q);

  and

(4) that SGI had constructive notice of the lawsuit, id. ¶ 35(r).

Taking each of these categories in turn, viewed in the light most favorable to the

EEOC, none are sufficient to plausibly claim that SGI had constructive notice of the

lawsuit. The complaint quotes portions of the purchase agreement signed by SGI's

principal where the parties agreed that the property would be sold "as is," that SGI

waived all claims against the seller for any losses, and that the buyer would inspect the

property condition. But these allegations say nothing about SGI's duty to perform due

diligence vis-à-vis the behavior or liabilities of the previous corporations that owned the

property. Rather, by their plain language, these terms allocated liabilities concerning the

parcel of land.[3]

---

[3] The EEOC argues that the purchase agreement also meets the first Trujillo exception
(where the purchaser expressly or impliedly assumes the seller's liabilities). The court is
not at all persuaded. Indemnity contracts "must clearly and definitely show an intention
to indemnify against the loss or liability involved." Allied Hotels Co. v. H. & J. Const.
Co., 376 F.2d 1, 2 (10th Cir. 1967). The purchase agreement did not do so. As described

Second, the existence of the lawsuit at the time of the purchase is not sufficient to show that SGI should have known that it could be exposed to successor liability.  The EEOC has not alleged that there were any facts made known to SGI that would have given it notice to inquire further.  See Trs. of Chi. Plastering Inst. Pension Tr. v. Elite Plastering Co., 603 F. Supp. 2d. 1143, 1151 (N.D. Ill. 2009) (requiring that successor must have prior knowledge of facts that would then mandate performing further diligence).  If the simple existence of a lawsuit were enough to impute constructive notice to a successor owner, such a rule would require prospective purchasers to search infinite court dockets, using all possible names of their predecessors to determine whether potential liabilities may arise.  Courts should be reluctant to impose due diligence requirements that are the product of 20–20 hindsight.

The EEOC suggests that a Google search could have revealed information pertinent to the dispute, but the court is extremely hesitant to require a particular internet search tool, let alone impose a methodology for such searches.  Such is far afield from the proper, and properly limited, role of the court in commercial and social transactions.

Next, the EEOC alleges that SGI's president did not complete a thorough review of the business.  This conclusion adds nothing, however, without allegations that there were some facts available to SGI that would call for it to perform such diligence.  See Wheeler, 974 F.2d at 1237 & n.9 (successor company not liable even when it did not

---

in the complaint, the purchase agreement simply released Jai from liability for claims that SGI might have against Jai but did not broadly indemnify Jai for its past liabilities.  See Fourth Am. Compl. ¶¶ 35(a)–(c).

perform due diligence); <u>Trs. of Chi. Plastering Inst. Pension Tr.</u>, 603 F. Supp. 2d. at 1151. The notice analysis does not turn on the diligence exercised. Rather, it turns on whether there were facts and circumstances of which a party had a duty to take notice. <u>See also</u> <u>Constructive Notice</u>, Black's Law Dictionary (11th ed. 2019). Imposing a duty to uncover an employment dispute involving a predecessor's predecessor, with little or no knowledge of circumstances that mandate further inquiry, would turn constructive notice into needle-in-a-haystack notice.

As for the last category of allegations concerning notice, that SGI had constructive notice of the employment dispute when it purchased the property, labels and legal conclusions do not suffice for facts. The court will not consider this category. <u>See</u> <u>Twombly</u>, 550 U.S. at 555.

The EEOC has failed to allege sufficient facts to show that SGI had notice of the employment dispute when it purchased the Taos Hotel and dismisses the claim against SGI under Rule 12(b)(6).[4]

NOW, THEREFORE, IT IS ORDERED, ADJUDGED, and DECREED that: Defendant SGI, LLC's Motion to Dismiss for Lack of Subject Matter Jurisdiction and Failure to State a Claim filed September 10, 2018 (ECF No. 203) is granted on the basis of a failure to state a claim and denied on the basis of subject matter jurisdiction.

---

[4] SGI also contends that the EEOC has not alleged sufficient facts to satisfy the remaining <u>MacMillan</u>/<u>Trujillo</u> factors. Def.'s Mot. to Dismiss at 8–10. Having already decided in favor of SGI on the basis of lack of notice, the court does not reach the merits of SGI's additional argument.

DATED this <u>20th</u> day of August 2019, at Santa Fe, New Mexico.

<u>/s/ Paul Kelly, Jr.</u>
United States Circuit Judge
Sitting by Designation

Counsel:
Paul Frye and W. Gregory Kelly, Frye and Kelly, P.C., Albuquerque, New Mexico for
Defendant SGI, LLC.

Jeff A. Lee, Senior Trial Attorney, Equal Employment Opportunity Commission,
Albuquerque Area Office, Albuquerque, New Mexico, for Plaintiff EEOC.

# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

---

EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION,

      Plaintiff,

v.

ROARK-WHITTEN HOSPITALITY 2,
LP d/b/a WHITTEN INN, JAI
HANUMAN, LLC, d/b/a WHITTEN INN
TAOS AND/OR EL CAMINO LODGE,
AND SGI, LLC d/b/a EL CAMINO
LODGE,

      Defendants.

No. 1:14-cv-00884-PJK-LF

---

## FINDINGS OF FACT AND CONCLUSIONS OF LAW
## ON DEFAULT HEARING

---

THIS MATTER came before the court on a default hearing pursuant to Fed. R.

Civ. P. 55(b)(2), and the court now enters its findings of fact and conclusions of law.

### Findings of Fact

1.  The Equal Employment Opportunity Commission (EEOC) filed this public

enforcement action on September 30, 2014 seeking relief for eight named

charging parties.  Compl. (ECF No. 1).  The Complaint alleged that Defendant

Roark-Whitten Hospitality 2 (RW2) engaged in unlawful employment

practices by creating a hostile work environment, engaging in discriminatory practices, and retaliating against employees at a hotel owned by RW2 in Taos, New Mexico (Taos Hotel). Id. at 9 ¶ 77–12 ¶ 97.

2. After learning that RW2 sold the Taos Hotel, the EEOC filed an amended complaint on December 22, 2014, adding as a defendant "the unknown owner and/or XYZ Company(s)/Corporations." Am. Compl. at 2 (ECF No. 4).

3. Thereafter, on August 5, 2016, the EEOC moved to substitute Jai Hanuman LLC (Jai) "for the previously unknown XYZ Company(s)/Corporations." Pl.'s Renewed Mot. to Am. Compl. at 1 (ECF No. 52). The court granted the request, and the EEOC filed its Second Amended Complaint (SAC) on December 30, 2016. See SAC (ECF No. 87).

4. After learning that Defendant Jai sold the Taos Hotel to SGI, LLC (SGI), the EEOC filed its second motion to amend the complaint to add SGI as a defendant. Pl.'s Second Mot. to Am. Compl. to Add SGI, Ltd. as a Def., Dec. 16, 2016 (ECF No. 86). Jai and RW2 opposed the addition of SGI, Def.'s Resp. to Pl. EEOC's Second Mot. to Am. Compl. to Add SGI, LLC as a Def., Jan. 17, 2017 (ECF No. 94), and Jai moved to dismiss the SAC pursuant to Fed. R. Civ. P. 12(b)(6). Def. Jai Hanuman LLC's 12(b)(6) Mot. to Dismiss, Jan. 19, 2017 (ECF No. 96). The court granted the EEOC's second motion to amend and denied Jai's motion to dismiss. Mem. Op. & Order, Sept. 21, 2017 (ECF No. 178).

5. Counsel for RW2 and Jai withdrew on September 11, 2017. Order Granting Mot. to Withdraw, Sept. 11, 2017 (ECF No. 177). The EEOC moved for civil contempt against RW2 and Jai based upon a failure to obtain new counsel by October 2, 2017 and otherwise defend. Pl. EEOC'S Mot. for Civil Contempt of Ct. Against Def. Roark Whitten 2, LLP & Def. Jai Hanuman, LLC, Oct. 6, 2017 (ECF No. 181). Larry Whitten, President of RW2, informed the court that RW2 was unable to retain an attorney due to lack of funds but offered to pay a total of $35,000. Letter, Oct. 12, 2017 (ECF No. 183); Proposed Findings & Recommended Disposition, Nov. 2, 2017 at 3 (ECF No. 187). David Patel, principal of Jai, informed the court that Jai was unable to retain a lawyer. Proposed Findings at 3, Nov. 2, 2017 (ECF No. 187). Of course, the business entities would require counsel to represent them. D.N.M. LR-Civ. 83.7.

6. Upon recommendation of a magistrate judge, the district court entered a default judgment against RW2 and Jai on all issues of liability, Fed. R. Civ. P. 55(a), envisioning a separate hearing as to damages and any injunctive relief, Fed. R. Civ. P. 55(b)(2). Am. Order Adopting Proposed Findings & Recommended Disposition, Nov. 30. 2017, at 2 (ECF No. 190).

7. The EEOC filed its Third Amended Complaint and added SGI as a party under a theory of successor liability. Pl.'s Third Am. Compl., Sept. 28, 2017 (ECF No. 179). SGI moved to dismiss it, arguing that the EEOC failed to adequately plead the essential elements necessary to establish successor liability, including

3

that SGI had notice of the lawsuit at the time it purchased the Taos Hotel. Def.'s Mot. to Dismiss, Oct. 26, 2017 (ECF No. 186). The court ruled that the Third Amended Complaint failed to adequately plead that SGI had notice of the lawsuit at the time it purchased the Taos Hotel. Mem. Op. & Order at 8–10, July 30, 2018 (ECF No. 199). While the court granted SGI's motion to dismiss, it also granted leave to the EEOC to amend its complaint to cure the notice issue. Id. at 9–10.

8. On August 13, 2018, the EEOC filed its Fourth Amended Complaint. Fourth Am. Compl., Aug. 3, 2018 (ECF No. 201). On September 10, 2018, SGI moved to dismiss the Fourth Amended Complaint under Rule 12(b)(1) for lack of subject matter jurisdiction and under Rule 12(b)(6) for failure to state a claim upon which relief can be granted. Def. SGI LLC's Mot. to Dismiss (ECF No. 203). This court granted the motion to dismiss on the basis that the Fourth Amended Complaint failed to allege sufficient facts to show that SGI had notice of the employment dispute when it purchased the Taos Hotel. Mem. Op. & Order, Aug. 20, 2019, at 10 (ECF No. 215).

9. The court set default matters for hearings on October 3, 2019. Notice of Settings–Default Hr'gs, Aug. 23, 2019 (ECF No. 216). Parties were allowed to file ten-page pre-hearing briefs. Id. Upon telephonic inquiries from counsel, the court extended the time for the default hearing to 90 minutes and allowed 50 pages of exhibits to the pre-hearing briefs. Min. Order, Sept. 5, 2019 (ECF

Add.-015

No. 217).  The court placed no restrictions on what the parties could present (including live testimony) at the hearing.[1]

10.  At the hearing Defendants RW2 and Jai were represented by counsel, Pat Rogers, on a limited entry of appearance and the EEOC was represented by counsel Jeff Lee and Loretta Medina.  Clerk's Min., Oct. 10, 2019 (ECF No. 225).

11.  The EEOC requests a judgment for injunctive relief and damages from Defendants RW2 and Jai (successor liability): (1) permanently enjoining them from engaging in discrimination or retaliation against employees in New Mexico, and (2) directing them to file a written notice containing specific information with EEOC within five days of opening a new hotel business in this state.  See Pl.'s Prehr'g Br., at 3, 8 (ECF No. 221).  At the hearing, the EEOC submitted a proposed form of injunction.  EEOC also requested (1) $600,760.38 in back pay and prejudgment interests for the seven charging parties and one aggrieved individual, (2) $500,000.05 — or $45,454.54 per

---

[1] At the hearing, the court reminded counsel that counsel could have moved for additional pages.  Hr'g Tr., Oct. 10. 2019, at 60–61, Oct. 10, 2019 (ECF No. 224).  The court requested prehearing briefs (and any exhibits) just as it would for a trial.  In that regard, at a trial, the parties still put on evidence, just as the parties were free to do in this case. Although the EEOC explained that "we would be more than happy to supplement the back pay calculations and what we normally do, would be done in the course of a jury trial, or something to that effect, if the Court would allow," Hr'g Tr., Oct. 10. 2019, at 54:19–23, the time to come forward with that information has passed — the hearing was not a tryout for a later main event.

5

Add.-016

claimant — in compensatory damages for 11 aggrieved individuals, and (3) $49,999.95 in punitive damages to be distributed among the 11 aggrieved individuals.  Id. at 5–7; see 42 U.S.C. §§ 1981a, 2000e-5(g)(1).

12.  The EEOC claimed backpay as follows:

| Employee[2] | Termination Date[3] | Backpay | Plus Interest |
|---|---|---|---|
| Kathy Archuleta | July 31, 2009 | $115,608.36 | $156,009.20 |
| Martín Gutierrez | August 16, 2009 | $99,355.73 | $122,847.80 |
| Marcos Jeantette | August 9, 2009 | $2,087.00 | $3,023.51 |
| Michelle Martinez | August 16, 2009 | $7,276.60 | $10,485.37 |
| Dale Quintana | August 17, 2009 | $3,071.25 | $4,434.03 |
| Jennie Valdez | August 17, 2009 | $77,357.80 | $105,277.97 |
| Rebecca del Palacio | August 30, 2009 | $118,526.46 | $148,664.15 |
| Maria Tafoya | June 23, 2011 | $38,699.34 | $50,018.35 |

At the hearing, the EEOC indicated that Mr. Gutierrez's backpay should have ended with the quarter beginning January 2015, rather than the quarter beginning July 2019.  Hr'g Tr., Oct. 10. 2019, at 16:8–9.

13.  For their part, RW2 and Jai sought dismissal notwithstanding the entry of default on the grounds that EEOC failed to plead facts satisfying Title VII's employee numerosity requirement against either RW2 or Jai or, alternatively,

---

[2] See Pl.'s Prehr'g Br., Exs. 16–24 (ECF Nos. 221-17–221-25).

[3] See SAC (ECF No. 87); Pl.'s Prehr'g Br., Exs. 16–24 (ECF Nos. 221-17–221-25).

6

that EEOC failed to plead notice sufficient to hold Jai liable under a theory of successor liability.  <u>See</u> Defs.' Prehr'g Br. at 1, 8 (ECF No. 222).

14. At the hearing, none of the parties offered testimony from live witnesses.  The only evidence relevant to damages was submitted in the form of affidavits, declarations, or other exhibits.  Some of the EEOC's declarations are unsigned.  Pl.'s Prehr'g Br., Exs. 14–15.

15. The parties, EEOC and RW2 and Jai raised several objections at the hearing, mostly in reference to the submissions on damages, which the court took under advisement.

16. EEOC made the following objections and motions which I now rule upon.

    a. Objection to the admission of supplementary exhibits offered by RW2 and Jai at the default hearing as out-of-time.  Hr'g Tr., Oct. 10, 2019, at 23:22–24, 29:24–30:8.  This objection is overruled.  EEOC has not shown any prejudice resulting from consideration of these exhibits, many of which come from the record.

    b. Objection to RW2 and Jai's claimed mischaracterization of interviews conducted by EEOC's expert, Dr. Berk-Seligson.  <u>Id.</u> at 31.  This objection is overruled.  The charges, EEOC complaints, what was pled in the SAC, and Dr. Berk-Seligson's interviews speak for themselves.

    c. Objection to RW2 and Jai's discussion of interviews conducted by Dr. Berk-Seligson as not germane to damages.  <u>Id.</u> at 32.  This objection is

overruled.  The court will consider RW2 and Jai's arguments and evidence for what they are worth.

    d.  Motion to strike Exhibit H (ECF No. 221 #8) to RW2 and Jai's Pre-Hearing Brief as hearsay.  Hr'g Tr., Oct. 10, 2019, at 39.  This motion is denied.  Counsel for RW2 contends that the statement was a deposition exhibit and the matter was explored on deposition.

17.  RW2 and Jai made the following objections and motions which I now rule upon:

    a.  Motion to strike EEOC Ex. No. 2 (ECF No. 221-3) (Expert Report) under Rule 702.  Hr'g Tr., Oct. 10, 2019, at 25:4–26:6.  This motion is granted.  The court is not persuaded that Dr. Berk-Seligson's testimony would be reliable and reliably applied.  See Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579 (1993).  Further, it is not clear that Dr. Berk-Seligson's testimony would "help the trier of fact to understand the evidence or to determine a fact in issue."  Fed. R. Evid. 702(a).  Other courts have reached similar conclusions about Dr. Berk-Seligson.  See Pacheco v. New York Presbyterian Hosp., 593 F. Supp. 2d 599, 624–25 (S.D.N.Y. 2009); EEOC v. Sephora USA, LLC, 419 F. Supp. 2d 408, 418 (S.D.N.Y. 2005); but see EEOC v. Premier Operator Servs., Inc., 113 F. Supp. 2d 1066, 1069–70 (N.D. Tex. 2000).

    b.  Motion to strike EEOC exhibits 5–15 (ECF Nos. 221-6–221-16) as hearsay.  Hr'g Tr., Oct. 10. 2019, at 25:1–6 (ECF Nos. 221-5–221-15).

Add.-019

This motion is denied.  RW2 and Jai had access to the declarations
contained in these exhibits for several weeks and failed to object.

c.  Motion to strike EEOC backpay calculations as faulty and insufficient
under Fed. R. Evid. 403, 1006.  Hr'g Tr., Oct. 10, 2019, at 36–38; see
SAC (ECF Nos. 221-17–221-26).  The EEOC provided the basic
methodology for the calculations and some of the data in response to an
earlier interrogatory by RW2.  Pl.'s Prehr'g Br., Ex. 16 (ECF No. 221-
17).  The EEOC sought the difference between the pay the person would
have received had he or she not been discharged and the amount
actually earned, contingent on mitigation.  Id.  The EEOC updated the
calculations and extrapolated them through October 2019, while
acknowledging that it was missing some data on interim earnings for
two employees.  Id., Ex. 1 at ¶¶ 7–8 (ECF No. 221-2).

d.  The court is concerned about the sources of the underlying data,
particularly from 2015 on and especially concerning mitigation.  As the
court expressed at the hearing, some of the damage calculations are
extraordinary, as long as ten years.  Hr'g Tr., Oct. 10, 2019, at 14:18–
20.  For example, Rebecca del Palacio (an executive housekeeper) was
told that her wages would be reduced and chose to resign on August 30,
2009 rather than work for a reduced amount.  SAC ¶¶ 70–73 (ECF No.
87).  Yet EEOC's backpay calculation has her wages at $7,090 per
quarter (offset by earnings) from July 2009 to the present.  Pl.'s Prehr'g

9

Br., Ex. 24 (ECF No. 221-25).  For another example, Martín Gutierrez

(a night auditor) who was let go on August 16, 2009, is shown as

receiving $3,987 per quarter (offset by earnings) from July 2009 to

January 2015.  Hr'g Tr., Oct. 10, 2019, at 16.  Counsel for the EEOC

candidly admitted that RW2 at the time paid more than other employers

in the area and this occurred during a recession.  Id. at 15.  While the

court does not quarrel with the equitable nature of backpay and the

notion that the difficulty of determining damages should not bar

recovery, the court also believes that fundamental fairness requires that

one's adversary should be provided enough information to analyze

default damages being claimed.  Counsel for the EEOC had every

opportunity to provide the underlying documentation at the hearing.

Merely because the court asked for prehearing briefs (and limited the

number of pages in those briefs and any exhibits) did not mean it

limited the EEOC from offering live testimony or seeking to admit

additional exhibits at the hearing.  The court declines to award backpay.

### Conclusions of Law

18.  In order to enter or effectuate a default judgment, a district court may hold a

hearing to "(A) conduct an accounting; (B) determine the amount of damages;

(C) establish the truth of any allegation by evidence; or (D) investigate any

other matter."  Fed. R. Civ. P. 55(b)(2).  Unless the district court has all the

evidence required before it to make a fully informed decision, an evidentiary hearing is generally required.  <u>SEC v. Smyth</u>, 420 F.3d 1225, 1231–33 (11th Cir. 2005).

19.  A defaulting defendant admits a complaint's well-pleaded allegations, but not legal conclusions; there must be a sufficient basis in the pleadings to support the judgment.  <u>Bixler v. Foster</u>, 596 F.3d 751, 762 (10th Cir. 2010).  Indeed, the Tenth Circuit has stated that once default has entered, the district court has a responsibility to undertake this task.  <u>Id.</u>  If a plaintiff's claim would be barred or dismissed on a Rule 12(b)(6) motion, it cannot be the basis of a default judgment.  <u>Id.</u> (citing <u>Nishimatsu Constr. Co. v. Houston Nat'l Bank</u>, 515 F.2d 1200, 1206 (5th Cir. 1975)); <u>see also</u> <u>Surtain v. Hamlin Terrace Found.</u>, 789 F.3d 1239, 1244–45 (11th Cir. 2015).  To survive such a motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009) (<u>quoting</u> <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 570 (2007)).  What is required is "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  <u>Ashcroft</u>, 556 U.S. at 678.  There must be "more than a sheer possibility that a defendant has acted unlawfully."  <u>Id.</u>

20.  The operative document is the SAC.  Hr'g Tr., Oct. 10, 2019, at 4:24–5:2.  Applying these standards, the court will dismiss as to Jai because the SAC simply does not state a plausible claim against Jai as to successor liability on

Add.-022

the notice element, i.e., that Jai as a successor had notice of the charges.  See

Trujillo v. Longhorn Mfg. Co., 694 F.2d 221, 224 (10th Cir. 1982) (relying on

EEOC v. MacMillan Bloedel Containers, Inc., 503 F.2d 1086, 1094 (6th Cir.

1974)); see also Mem. Op. & Order filed July 30, 2018 at 8 (ECF No. 199)

(Vazquez, J.) (considering notice "a critical element of a successor liability

claim").  The court recognizes that a prior judge assigned to the case repeated

the notice allegation from the SAC (in contrast with stating that various facts

could demonstrate continuity) and then stated that Jai did not make a

Twombly/Iqbal argument.  Mem. Op. & Order, Sept. 21, 2017, at 10 (ECF No.

178) (Armijo, J.).  Of course, the prior judge's order was interlocutory.

21.  More importantly, in its prior motion to dismiss, Jai made the broad argument

that it could not be liable merely because it sold the hotel rather than a

Twombly/Iqbal argument.  Although the prior judge commented that the

successor liability issue (including notice) could be addressed on summary

judgment after discovery, id. at 12 n.3, the EEOC is not relieved of properly

alleging the notice element.  The Court was clear in Ashcroft that "[w]hile

legal conclusions can provide the framework of a complaint, they must be

supported by factual allegations."  556 U.S. at 679.  The well-pleaded facts

must "permit the court to infer more than the mere possibility" of liability.  Id.

22.  After alleging the hotel was sold to Jai in 2014, the SAC alleges:

15.   After this lawsuit was filed, and on or after October 5,
2014, Jai Hanuman LLC's registered agent, David "Dharmesh" Patel
reported to news agencies that he was the new owner of the Whitten

12

> Inn in Taos, New Mexico. Through Patel, Jai Hanuman had notice of
> the Charges filed with the Commission that are the subject of this
> lawsuit.

SAC at 4, ¶ 15 (ECF No. 87).

23. The fact that Jai's registered agent merely reported to news agencies that he

was the new owner of the Whitten Inn does not create any inference (let alone

a reasonable one) that he (and in turn Jai) had notice of the charges.  Nothing

in the SAC or the default hearing suggested that Patel or Jai had the requisite

notice.

24. On the other hand, after considering the SAC, the court concludes that it

plausibly alleges that RW2 operated the hotel with "fifteen or more employees

for each working day in each of twenty or more calendar weeks in the current

or preceding calendar year . . . ."  42 U.S.C. § 2000e(b).  See SAC at 1 (listing

eight charging parties); id., at 3, ¶ 12 (alleging numerosity).  The numerosity

requirement is an element of a Title VII claim, not jurisdictional.  Arbaugh v.

Y & H Corp., 546 U.S. 500, 512–516 (2006).  Unlike the allegation concerning

notice to Jai, this factual allegation does not suffer from an inferential leap.

25. As stated by EEOC's counsel at oral argument, the gravamen of the case is a

"No Spanish" policy allegedly implemented by the employer, Mr. Whitten.

Hr'g Tr., Oct. 10, 2019, at 6; see Maldonado v. City of Altus, 433 F.3d 1294

(10th Cir. 2006) (consideration of an English-only policy), overruled on other

grounds as recognized by Metzler v. Fed. Home Loan Bank of Topeka, 464

F.3d 1164, 1171 n.2 (10th Cir. 2006); Hr'g Tr., Oct. 10, 2019, at 6:12–19.

That said, the SAC alleges that RW2 (Mr. Whitten as President) acquired the

hotel in July 2019, and on July 31, 2019 announced a policy that Spanish was

not to be spoken in his presence because he did not understand it.  SAC ¶¶ 34–

35 (ECF No. 87.  EEOC's counsel maintained that the employees were fearful

of speaking Spanish because they did not know when they would be in Mr.

Whitten's presence.  Hr'g Tr., Oct. 10, 2019, at 7:11–25.  According to

counsel, there was no business necessity for a "No Spanish" policy.  In

addition, Mr. Whitten asked the employees to anglicize their names.  SAC ¶¶

53, 60 (ECF No. 87) (requiring, e.g., Marcos to refer to himself as "Mark" and

Martín to pronounce his name "Martin"); see also Pl.'s Prehr'g Br., Ex. 8 (ECF

No. 221) (requiring Susana to call herself "Susan").  As noted in paragraph 12

above, most of the claimants were terminated shortly after a July 31 meeting.

26.  The SAC alleges that Mr. Whitten used racial epithets, ridiculed an

employee's accent, treated Hispanic and Black employees and customers

poorly, and otherwise treated the employees of color differently from White

employees.  SAC ¶¶ 78–83 (ECF No. 87).

27.  The court has considered the EEOC's request for compensatory and punitive

damages.  The SAC and charging documents make it clear that the policy

announced by Mr. Whitten was that Spanish was not to be spoken in his

presence for which a case of business necessity seems obvious — no one

contends that Mr. Whitten did not have a business necessity to understand what

his employees were saying.  See Montes v. Vail Clinic, Inc., 497 F.3d 1160, 1171 (10th Cir. 2007); 29 C.F.R. § 1606.7(b).

28.  In light of the relatively short time frame in which the actions occurred given the abrupt end of the relationship between Mr. Whitten and the charging parties and aggrieved employees, and the stated basis of the gravamen of the SAC, the court will award $35,000 to be distributed by the EEOC.  Hr'g Tr., Oct. 10, 2019, at 19–20.

29.  The court declines to award punitive damages.  Punitive damages may be awarded in Title VII cases where "the complaining party demonstrates that the respondent engaged in a discriminatory practice or discriminatory practices with malice or with reckless indifference to the federally protected rights of an aggrieved individual."  42 U.S.C. § 1981a(b)(1).  The standard is higher than for compensatory damages.  Kolstad v. Am. Dental Ass'n, 527 U.S. 526, 534 (1999).  The EEOC argues that Mr. Whitten was RW2's agent and that punitive damages are warranted because he admitted asking three employees to modify or "Anglicize" their names and by limiting the use of Spanish.  Pl.'s Prehr'g Br. at 6–7 (ECF No. 87).  The court is not persuaded.

30.  The court also declines to award the EEOC injunctive relief.  42 U.S.C. § 2000e–5(g)(1).  At the hearing, the EEOC tendered a proposed injunction which would permanently enjoin the defendants from engaging in unlawful employment practices based upon race, color, and/or national or origin, and retaliation/reprisal.  See also Pl.'s Prehr'g Br. at 8–9 (other injunction terms)

(ECF No. 87).  As the EEOC alleged in the Fourth Amended Complaint, RW2 (and for that matter Jai) no longer operate the hotel and "are unable to provide certain relief in this lawsuit, including reinstatement, injunctive relief and other relief," because the hotel now has another owner, SGI.  See FAC, Aug. 13, 2018, at ¶ 28 (ECF No. 201).  The defendants contend that "RW2 has not conducted any business in New Mexico since 2014 and Jai has not conducted any business in New Mexico since 2016," Def.'s Prehr'g Br. at 2 (ECF No. 222).  At the hearing, the EEOC stated that it asks for injunctive relief in every case, and here it seeks injunctive relief "if they do ever come into the state again to operate in the hotel business."  Hr'g Tr., Oct. 10, 2019, at 21:23–24.

31.  The most important factor in awarding injunctive relief is "whether the facts indicate a danger of future violations . . . ."  Roe v. Cheyenne Mountain Conference Resort, Inc., 124 F.3d 1221, 1230 (10th Cir. 1997).  Nothing suggests that RW2 (and for that matter Jai) have any plans to operate any hotel or conduct business in New Mexico, hence, the possibility of any recurrent violation is completely speculative and injunctive relief is not warranted.  See EEOC v. Wal-Mart Stores, Inc., 187 F.3d 1241, 1250–51 (10th Cir. 1999).  There must be something more than a conjectural or hypothetical possibility.  Id. at 1250 (quoting United States v. W.T. Grant Co., 345 U.S. 629, 633 (1953)).

A judgment will be entered accordingly.

DATED this <u>30th</u> day of December 2019, at Santa Fe, New Mexico.

<u>/s/ Paul Kelly, Jr.</u>
United States Circuit Judge
Sitting by Designation

17

Add.-028

# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION,

     Plaintiff,

v.

ROARK-WHITTEN HOSPITALITY 2,
LP d/b/a WHITTEN INN, JAI
HANUMAN, LLC, d/b/a WHITTEN INN
TAOS AND/OR EL CAMINO LODGE,
AND SGI, LLC d/b/a EL CAMINO
LODGE,

     Defendants.

No. 1:14-cv-00884-PJK-LF

# JUDGMENT

THIS MATTER came before the court, and the court having rendered its decisions
(ECF Nos. 215, 226),

IT IS ORDERED, ADJUDGED, and DECREED that Plaintiff EEOC shall take
nothing on its complaints against Defendant Jai Hanuman, LLC, d/b/a Whitten Inn Taos
and/or El Camino Lodge, and Defendant SGI, LLC d/b/a El Camino Lodge, and these
two Defendants are awarded their costs of action.

IT IS FURTHER ORDERED, ADJUDGED, and DECREED that Plaintiff EEOC
is awarded damages against Defendant Roark-Whitten Hospitality 2 LP d/b/a Whitten Inn

in the amount of $35,000, together with its costs of action against Defendant Roark-

Whitten Hospitality 2 LP d/b/a Whitten Inn.

DATED this <u>30th</u> day of December 2019, at Santa Fe, New Mexico.

<u>/s/ Paul Kelly, Jr.</u>
United States Circuit Judge
Sitting by Designation

2

## <u>CERTIFICATE OF COMPLIANCE</u>

I certify that this brief complies with the type-volume limitation of

Fed. R. App. P. 32(a)(7)(B)(i) because it contains 12,627 words, excluding

the parts of the brief exempted by Fed. R. App. P. 32(f).

I certify that this brief complies with the typeface requirements of

Fed. R. App. P. 32(a)(5)(A) and the preference of 10th Cir. R. 32(A) and the

type style requirements of Fed. R. App. P. 32(a)(6) because it has been

prepared in a proportionally spaced typeface using Microsoft Word 2016 in

Palatino Linotype 14 point.


<u>s/Anne Noel Occhialino</u>
ANNE NOEL OCCHIALINO
Senior Appellate Attorney
EQUAL EMPLOYMENT
 OPPORTUNITY COMMISSION
Office of General Counsel
131 M St. N.E., 5th Fl.
Washington, D.C. 20507
(202) 663-4724 (phone)
Annenoel.Occhialino@eeoc.gov


Dated: May 27, 2020

C-1

## CERTIFICATE OF PRIVACY REDACTIONS

I, Anne Noel Occhialino, hereby certify that all required privacy

redactions have been made, as required by 10th Cir. R. 25.5 and ECF User

Manual, Section II, Part J(a).

s/ Anne Noel Occhialino
ANNE NOEL OCCHIALINO
Senior Appellate Attorney
EQUAL EMPLOYMENT
 OPPORTUNITY COMMISSION
Office of General Counsel
131 M St. N.E., 5th Fl.
Washington, D.C. 20507
(202) 663-4724 (phone)
Annenoel.Occhialino@eeoc.gov

Dated: May 27, 2020

## <u>CERTIFICATE OF HARD COPIES BEING EXACT REPLICA</u>

I, Anne Noel Occhialino, hereby certify that the hard copies

submitted to this Court, once the brief is deemed compliant and the

temporary suspension of hard copies due to COVID-19 has ended, are/will

be exact copies of the ECF version filed electronically.

<u>/s Anne Noel Occhialino</u>
ANNE NOEL OCCHIALINO
Senior Appellate Attorney
EQUAL EMPLOYMENT
 OPPORTUNITY COMMISSION
Office of General Counsel
131 M St. N.E., 5th Fl.
Washington, D.C. 20507
(202) 663-4724 (phone)
Annenoel.Occhialino@eeoc.gov

Dated: May 27, 2020

## <u>CERTIFICATE OF VIRUS SCAN</u>

I, Anne Noel Occhialino, certify that this electronic submission was scanned for viruses with the most recent version of a commercial virus scanning program (Trend Micro Security Agent Real-Time Scan) and found to be free from viruses.

<u>s/ Anne Noel Occhialino</u>
ANNE NOEL OCCHIALINO
Senior Appellate Attorney
EQUAL EMPLOYMENT
  OPPORTUNITY COMMISSION
Office of General Counsel
131 M St. N.E., 5th Fl.
Washington, D.C. 20507
(202) 663-4724 (phone)
Annenoel.Occhialino@eeoc.gov

Dated: May 27, 2020

<u>CERTIFICATE OF SERVICE</u>

I, Anne Noel Occhialino, hereby certify that I electronically filed the foregoing brief with the Court via the appellate CM/ECF system on May 27, 2020, and will send seven copies of the foregoing brief by next business day delivery, postage pre-paid, to be received by this Court within five days of this brief being deemed compliant and once the temporary suspension of hard copies (due to COVID-19) has ended. 10th Cir. R. 31.5.  I also certify that counsel of record, who have consented to electronic service, will be served the foregoing brief via the appellate CM/ECF system.

<u>s/Anne Noel Occhialino</u>
ANNE NOEL OCCHIALINO
Senior Appellate Attorney
EQUAL EMPLOYMENT
  OPPORTUNITY COMMISSION
Office of General Counsel
131 M St. N.E., 5th Fl.
Washington, D.C. 20507
(202) 663-4724 (phone)
Annenoel.Occhialino@eeoc.gov